Argued and submitted October 25, 2007, affirmed July 2, 2008

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# JOEL MATTHEW McCOOL,
*Defendant-Appellant.*

Multnomah County Circuit Court
990130212; A114814

188 P3d 453

John E. Storkel argued the cause and filed the briefs for appellant.

Robert M. Atkinson, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

WOLLHEIM, J.

**WOLLHEIM, J.**

Defendant was convicted of various crimes following a shooting that injured multiple victims at a crowded New Year's party. On appeal, he argues that the trial court erred in (1) denying his motion for a new trial based on newly discovered evidence; (2) denying his motion to suppress evidence obtained during the execution of a search warrant; (3) admitting a picture of defendant that he believes was prejudicial; (4) "not determining prosecutorial misconduct"; and (5) imposing consecutive sentences in violation of his Sixth Amendment right to a jury trial. For the reasons that follow, we affirm.

## I. BACKGROUND

On the evening of January 2, 1999, as many as 300 guests attended a New Year's party at a restaurant in Portland. Villa was one of the partygoers. At some point in the early hours of January 3, Villa punched someone in the face, and that person retaliated with gunfire. Villa then ran toward the restaurant's dance floor, where the gunman continued shooting at him. A second gunman then began firing at the first, in an effort to protect Villa. During the melee, Villa and three other victims—Holmes, Owens, and Amos—suffered gunshot wounds. The gunmen both escaped.

In the hours following the shooting, a witness identified defendant as the first gunman. On the morning of January 3, Officer Anderson, who was assigned to investigate the shooting, followed up on that information and attempted to locate defendant. Using the Portland Police Data System, Anderson determined that defendant was "associated with" an apartment in Beaverton. Anderson and another officer, both in plain clothes, then drove to the apartment complex.

The two officers arrived at the complex around 2:30 p.m. When they arrived, they saw two males on the balcony of the apartment that they were investigating, one of whom, from a distance, resembled defendant in size and head shape. Anderson attempted to reposition their unmarked vehicle to survey the apartment, and, as he was doing so, a

white van with pink stripes drove past them. Based on a pre-vious contact with defendant, one of the officers knew that the van belonged to defendant. Although they were unable to see the driver's face because of the van's sun visor, they observed that the driver was the same person who had been on the balcony and who resembled defendant, and that a female and child were in the front passenger seat of the van. The officers attempted to follow the van but, by the time that they turned their own vehicle around, the van was gone.

The officers then took up position outside the apart-ment until midnight, waiting for the van to return. When the van did not return, Anderson applied for and obtained a search warrant for the apartment. The warrant authorized the officers to search the apartment and to "seize any 9mm semi-automatic pistol. All firearm accessories to include ammunition, holsters, cleaning equipment, receipts and bills of sale. Clothing worn by the suspect possibly stained with blood or body fluids."

On January 5, Anderson and a team of officers exe-cuted the warrant. The officers did not find any firearms or blood-stained clothing in the apartment. They did, however, seize a number of items that were not specifically identified in the warrant but that connected defendant to the apart-ment, including an envelope from Portland General Electric (PGE) addressed to defendant, a long distance phone bill for defendant, adhesive mailing labels bearing defendant's name, and a photo album containing pictures of defendant and his family and friends.

Eventually, two other witnesses—one of whom, Holmes, was a victim of the shooting—identified defendant as the first gunman. Initial efforts to locate defendant, how-ever, were unsuccessful. Then, on March 2, 1999, the van seen at the Beaverton apartment was found in Muskogee, Oklahoma. A year later, defendant was arrested in Memphis, Tennessee, after being stopped for speeding.

Defendant was tried on one count of attempted mur-der with a firearm (Villa), four counts of first-degree assault with a firearm (Villa, Holmes, Owens, and Amos), and five counts of unlawful use of a weapon with a firearm (for shoot-ing at Villa, Holmes, Owens, Amos, and the unknown second

gunman). During the course of the trial, a number of the state's witnesses denied being able to identify defendant as the shooter or claimed memory problems, despite having previously identified defendant in a police "photo throwdown." Holmes, however, continued to maintain that defendant was the one who shot her, and Amos testified that she saw defendant at the party. The state also relied on defendant's flight to Tennessee as evidence of his guilt.

Defendant's theory, on the other hand, was that the state did not produce any reliable evidence that defendant was even at the party, let alone evidence that he was the first gunman. Defendant's counsel argued that Holmes gave inconsistent statements to police and investigators and that she had simply lied about defendant's involvement to "get back at" one of defendant's close friends. As to the issue of flight, defendant's counsel argued that the officers could not even tell "for sure who that van belonged to and who drove that van. And then to make the leap that [defendant] somehow dumped it in Oklahoma, that defies common sense * * *." Moreover, defendant argued, the forensic evidence did not even establish whether the bullets that injured the multiple victims came from the same gun.

Defendant was convicted of attempted murder with a firearm and one count of first-degree assault for shooting at Villa. As to Holmes, Owens, and Amos, defendant was found not guilty of first-degree assault with a firearm but was convicted of the lesser included offense of second-degree assault. He was also convicted on all five counts of unlawful use of a weapon.

## II. ANALYSIS

### A. *First Assignment of Error*

In his first assignment of error, defendant argues that the trial court erred in denying his motion for a new trial based on newly discovered evidence. Defendant's motion for a new trial was supported by (1) affidavits from a number of individuals in Tennessee who averred that defendant was with them in Tennessee at the time of the shooting; (2) testimony from someone who claimed to have been an eyewitness to the shooting and was certain that defendant was not the

shooter; (3) testimony from a police officer who investigated the shooting; and (4) testimony from a doctor who examined Amos.[1] The trial court denied the motion:

> "[U]nder ORCP 64 B, I would find that the defendant has not met the burden of showing that the evidence was insufficient to justify the jury's verdicts in this matter, or that the evidence presented at the motion constituted new undiscovered evidence which could not have, with due diligence, been discovered at the time of trial or prior to trial."

Pursuant to ORS 136.535, motions for a new trial in criminal cases are governed by ORCP 64 B. That rule, in turn, provides that a new trial may be granted on the basis of "[n]ewly discovered evidence, material for the party making the application, which such party could not with reasonable diligence have discovered and produced at the trial." ORCP 64 B(4).

■      To justify a new trial under ORCP 64 B(4), newly discovered evidence must meet certain requirements:

> "(1)   It must be such as will probably change the result if a new trial is granted;
>
> "(2)   It must be such as, with reasonable diligence, could not have been discovered before or during the trial;
>
> "(3)   It must be such that it cannot, with reasonable diligence, be used during trial;
>
> "(4)   It must be material to an issue;
>
> "(5)   It must not be merely cumulative;
>
> "(6)   It must not be merely impeaching or contradicting of former evidence."

*State v. Arnold*, 320 Or 111, 120-21, 879 P2d 1272 (1994) (footnote omitted). The "reasonable diligence inquiry," the Supreme Court has explained, "does not focus on whether the evidence was discovered before trial; rather, it focuses on whether the party could not with reasonable diligence have discovered and produced the evidence at the trial." *Id.* at 119-20.

---

[1] Defendant elicited live testimony from various witnesses at the hearing on the motion for a new trial.

■     A detailed discussion of the post-trial affidavits and testimony offered by defendant would not benefit the bench, the bar, or the public. Suffice it to say that defendant has not demonstrated that any of the evidence offered in support of his motion was such that it could not, with reasonable diligence, have been discovered and produced at trial. As to the evidence that defendant was in Tennessee on the night of the shooting, defendant certainly knew before trial where he was and who he was with on that night. *See State v. Cadigan*, 212 Or App 686, 691, 159 P3d 348, *rev den*, 343 Or 223 (2007) ("ORCP 64 B(4) does not categorize information personally known to a defendant before trial, but not to the party's legal counsel until later, as 'newly discovered' evidence.").[2]

The testimony that defendant proffers from other witnesses suffers from a similar defect. In each instance, defendant offers testimony from witnesses who, at least at first blush, are of a type that could have been discovered as part of a reasonable pretrial investigation: an eyewitness who was allegedly talking to Holmes when she was shot and then pulled Holmes to the ground to protect her;[3] a police officer who investigated the shooting; and a doctor who treated one of the victims. Defendant, however, has not offered any evidence of the nature of the investigation that was undertaken by trial counsel or what types of efforts were made to locate various witnesses.[4] In sum, we agree with the trial

_____

[2] In fact, defendant filed a "Notice of Alibi Defense" before trial that identified one of the individuals in Tennessee who later filed an affidavit in support of defendant's motion for a new trial. In her post-trial affidavit, she states that defendant's trial counsel "was supposed to send [his investigator] to Memphis * * * and provide family members, neighbors in the community, and myself subpoenas, but he never did"; she further avers that trial counsel failed to provide her with funds to travel to the trial. Those allegations, if true, may be relevant to a claim for post-conviction relief based on inadequate assistance of counsel, but they do not support defendant's position that evidence of the alibi defense was "newly discovered."

[3] The eyewitness testified that he is also a cousin of Owens, one of the victims, and that he had discussed with Owens the "chain of events that took place that night." Given his multiple contacts with the event, it is not apparent why Owens's cousin could not have been located as part of an investigation of the shooting.

[4] The closest defendant comes regarding evidence that could not have been discovered with reasonable diligence concerns the doctor who treated Amos. Apparently, defendant's trial counsel was unsuccessful in locating the doctor during the trial, but the record does not demonstrate what efforts were made to locate him. However, based on our review of the doctor's testimony, even assuming that his testimony was "newly discovered," it does not materially aid defendant's case and

court's conclusion that defendant failed to carry his burden of demonstrating that the evidence in support of his motion for a new trial "could not with reasonable diligence have [been] discovered and produced at the trial." ORCP 64 B(4). For that reason, we reject defendant's first assignment of error.

## B.  *Second Assignment of Error*

In his second assignment, defendant argues that the trial court erred in denying his motion to suppress evidence seized during the search of his apartment, namely, an unopened letter from PGE addressed to defendant, a long distance phone bill identifying defendant, mailing labels bearing his name, and a photo album containing pictures of defendant and his family and friends. Defendant argues that the search warrant did not authorize the seizure of any of those items and that the seizure therefore violated his rights under Article I, section 9, of the Oregon Constitution[5] and the Fourth Amendment to the United States Constitution.[6] The state, in response, argues that the evidence was properly seized because the officers "were in a place where they had a right to be" and "had probable cause to believe that evidence that they saw was either contraband or evidence of a crime."

We need not decide whether the trial court erred in denying the motion to suppress the disputed evidence, because we conclude that the error, if any, was harmless under both the state and federal constitutions. *See State v. Poitra,* 206 Or App 207, 212, 136 P3d 87, *rev den,* 341 Or 245 (2006) (declining to address whether trial court committed evidentiary error where any error was harmless under state

---

is not evidence that "will probably change the result if a new trial is granted." *Arnold,* 320 Or at 120.

[5] Article I, section 9, provides that

"[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

[6] The Fourth Amendment provides that

"[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

and federal constitutions). Under Article VII (Amended), section 3, of the Oregon Constitution,[7] an error is harmless if there is little likelihood that it affected the verdict. *State v. Gibson*, 338 Or 560, 576, 113 P3d 423, *cert den*, 546 US 1044 (2005); *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). If the disputed testimony is merely cumulative of other evidence that already established the same fact, then the error is harmless. *Poitra*, 206 Or App at 212. Under the federal constitution, error is harmless if "the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 US 673, 681, 106 S Ct 1431, 89 L Ed 2d 674 (1986). Under that test, whether an evidentiary error is harmless depends on a number of factors, including the importance of the evidence, whether the evidence was cumulative, the presence or absence of evidence corroborating or contradicting the evidence, and the overall strength of the prosecution's case. *Id*. at 684.

■     As noted above, defendant's second assignment of error focuses on four items that were admitted into evidence: an unopened letter addressed to defendant; a phone bill sent to defendant; mailing labels; and a photo album. Those items, which linked defendant to the apartment, were offered by the state for one purpose: to prove that defendant fled from Oregon after the shooting in January 1999. *See State v. Minchue*, 173 Or App 520, 524, 24 P3d 386 (2001) ("Oregon courts have long held that evidence of flight is relevant as circumstantial evidence of guilty knowledge, which is some evidence of guilt.").

The state's theory was that, prior to the shooting, defendant was living in the Beaverton apartment, and that defendant left the apartment in haste and fled to Tennessee after the shooting. According to the state, the letter, phone bill, mailing labels, and photographs were evidence that defendant lived at the apartment. However, they were not the only evidence that the apartment was defendant's.

---

[7] Article VII (Amended), section 3, provides that, "[i]f the supreme court shall be of opinion * * * that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial[.]"

Anderson, the officer who applied for the search warrant, testified that he used the Portland Police Data System to "find a residence where [defendant] was associated with." He also testified regarding his *observations* of the apartment made during the search, including that he found various items that connected defendant to the apartment. Given that Anderson had a warrant to enter the residence, nothing prohibited him from testifying about what he observed in plain view in the apartment. Anderson also testified that, the day after the shooting, he saw an individual on the balcony of the apartment who resembled defendant; saw a van at the residence that the officers knew was defendant's van; watched the van leave the apartment; and knew that the van did not return that day. Defendant, on the other hand, offered no contrary evidence to suggest that the apartment was *not* his residence.

Furthermore, defendant stipulated that the photo album found in the apartment contained photographs of defendant and his family and friends. Where defendant voluntarily stipulated to the contents of the photo album at trial, there is no reason to exclude that evidence from a review of the record for harmless error purposes. *Cf. State v. McGinnis*, 335 Or 243, 254, 64 P3d 1123 (2003) (where defendant chooses "to take the stand and to meet the state's evidence * * * there is no reason to exclude defendant's testimony from a review of the record for harmless error"); *State v. Lopez*, 147 Or App 314, 316, 936 P2d 386, *rev den*, 326 Or 58 (1997) ("[A] defendant who chooses to take the stand and testify about certain facts cannot be heard to complain about the trial court's failure to grant a pretrial motion to suppress evidence of the same facts."). In light of the stipulation, the admission of photographs from the album and other evidence suggesting that defendant resided at the apartment was even more cumulative.

Nor was the disputed evidence probative beyond its cumulative effect of demonstrating that defendant resided at the apartment. That is, the envelope from PGE, the phone bill, the mailing labels, and the photographs did nothing to establish that defendant was at the residence on January 3, 1999, the day after the shooting, and was the person who fled in a van on that date. As defendant himself points out, the unopened envelope is date stamped July 1998, nearly six

months before the shooting; the phone bill is also dated months before the shooting; and the mailing labels and photographs were undated. Thus, none of those items tends to prove that defendant was actually at the residence *shortly after the shooting*. Rather, the state's primary evidence on that issue consisted of Anderson's testimony that he saw an individual who looked like defendant in a van that was associated with defendant; that the van did not return to the apartment and was later found in Muskogee, Oklahoma; and that defendant was eventually found in Memphis, Tennessee, in March 2000.

In short, if the jury considered evidence of defendant's flight to constitute circumstantial evidence of his guilt in this case, it was not because of the unopened letter, an old phone bill, or undated mailing labels and photographs; rather, it was because of uncontradicted testimony that defendant was known to reside at the apartment; that an individual resembling defendant drove away in a van that police knew to be his; that the van did not return to the apartment and was found in Oklahoma; and that defendant was found in Memphis, Tennessee. After reviewing the record as a whole, we conclude that the seizure and admission of an unopened letter from PGE, a phone bill, mailing labels, and photographs that connected defendant to the apartment was harmless beyond a reasonable doubt and did not affect the jury's verdict in this case.[8] For that reason, we reject defendant's second assignment of error.

## C. *Third Assignment of Error*

■　　In his third assignment, defendant argues that the trial court erred in admitting a photograph that he contends "reflects gang signs and gang apparel and was highly prejudicial in his case." The photograph at issue, Exhibit 67, is one of three photographs that were admitted from the album

---

[8] Defendant also argues that "the showing of the pictures seized during the search, to the jury, allowed the prosecutor to send a hidden message and create a biased jury through images of the defendant in gang apparel." Having reviewed the photographs, which the trial court carefully sanitized in regard to gang apparel and gang signs, we do not believe that the three photographs were prejudicial in that way. Defendant's arguments focus particularly on the admission of Exhibit 67, which is the subject of defendant's third assignment of error and is discussed more fully in response to that assignment.

seized at the Beaverton apartment. Exhibit 67, as it appears in the record on appeal, is a photograph of defendant and another individual, both of whom are wearing various combinations of red, white, and blue clothing; neither individual is displaying anything that a reasonable juror would conclude is a gang sign.

After filing his opening brief in December 2003, defendant moved to correct the record, on the ground that the photograph marked as Exhibit 67 in the appellate court record was not the same photograph that was shown to the jury. Rather, the photograph shown to the jury, according to defendant, depicted him in a red bandana and displaying a gang sign with his hand. On the state's motion, we remanded the case to the trial court to determine which photograph was received into evidence.

In November 2004, the trial court conducted a hearing to determine which of the two photographs was actually shown to the jury. The trial court ruled that defendant had not sustained his burden of demonstrating that the photograph of him in a red bandana and displaying a gang sign was actually shown to the jury. Defendant does not challenge that ruling on appeal and now asserts in his supplemental opening brief that "the Exhibit that is being argued about in Assignment of Error #3 is state's exhibit 67 which is currently in the record at the Court of Appeals."[9]

Having reviewed the version of Exhibit 67 that the trial court determined was shown to the jury, we are not persuaded that the exhibit was prejudicial to defendant. As noted above, the individuals are not wearing attire that is uniquely associated with gangs, nor are they displaying hand signals that are readily identifiable as gang symbols. If their hands are, in fact, displaying gang signs, they are so subtle that the average juror would not be able to discern them. Accordingly, we reject defendant's third assignment of error.

---

[9] Nonetheless, defendant continues to maintain "that the photograph marked state's exhibit #67 in the court file, prevents the appeal court from evaluating the inflammatory and wrongly prejudicial effect the originally received exhibit #67 had on the jury."

### D. *Fourth Assignment of Error*

■    Defendant's fourth assignment asserts that "the [t]rial court erred in not determining prosecutorial misconduct when the prosecution brought up evidence regarding witness intimidation despite not providing the information to the defense * * *." It is not clear what ruling defendant is challenging in that assignment; defendant does not contend that the trial court should have granted a mistrial, nor does he identify a particular evidentiary ruling that is the subject of the assignment. In any event, we are unpersuaded by defendant's arguments concerning prosecutorial misconduct and reject defendant's fourth assignment of error without further discussion.

### E. *Supplemental Assignment of Error*

■    In a supplemental assignment of error, defendant argues that the trial court erred in imposing consecutive sentences for defendant's conviction for attempted murder and his three convictions for second-degree assault. According to defendant, the trial court imposed those sentences based on facts that were neither found by the jury nor admitted by him, thereby violating his Sixth Amendment right to a jury trial. He concedes that he did not raise that issue below, but urges us to address it as error apparent on the face of the record in light of *State v. Ice*, 343 Or 248, 265, 170 P3d 1049 (2007), *cert granted*, ___ US ___ , 128 S Ct 1657 (2008) (holding that the trial court's imposition of consecutive sentences based on its own factual findings violated the defendant's Sixth Amendment rights).

This case is readily distinguishable from *Ice*. Here, the trial court imposed consecutive sentences on the ground that each count involved a "separate victim, separate harm." *See* ORS 137.123(5)(b) (authorizing consecutive sentences where "[t]he criminal offense for which a consecutive sentence is contemplated * * * created a risk of causing loss, injury or harm to a different victim than was caused or threatened by the other offense or offenses committed during a continuous and uninterrupted course of conduct"). Unlike in *Ice*, the jury's verdict in this case specifically identified the separate victims (Villa, Holmes, Owens, and Amos) for each of the counts on which the trial court imposed consecutive

sentences.[10] Considering that the jury necessarily found that those counts each involved different victims and different harms, it is far from obvious that the imposition of consecutive sentences violated defendant's right to a jury trial in this case. *See State v. Zweigart*, 344 Or 619, 188 P3d 242 (2008) (where jury necessarily found that counts involved different victims, trial court did not err in imposing consecutive sentences on those counts); *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990) (to be reviewable as error apparent on the face of the record, the claimed error must be "obvious, not reasonably in dispute").[11] Accordingly, we reject defendant's supplemental assignment of error.

Affirmed.

---

[10] *Ice* involved multiple crimes against a single victim. In a footnote, the court rejected the argument that "the trial court's finding that the two burglary counts did not arise from the same continuous and uninterrupted course of conduct inheres in the very fact that the jury found defendant guilty of two separate counts of the same crime." 343 Or at 267 n 7. The court declined to analyze the case in that way because "the indictment did not specify particular dates or otherwise distinguish between the two counts * * *." *Id*. Here, not only did the indictment specify the particular victim and harm in each count, but the jury instructions and verdict form did as well.

[11] We note that, under Article I, section 44(1)(b), of the Oregon Constitution, "No law shall limit a court's authority to sentence a criminal defendant consecutively for crimes against different victims." By its terms, that provision applies only to offenses committed after December 2, 1999. The offenses in this case were committed before that date.