Argued and submitted September 9, 2004, judgment of conviction and sentences, including sentences of death, affirmed in part and reversed in part; case remanded to circuit court for further proceedings June 3, 2005

STATE OF OREGON,
*Respondent,*

*v.*

TRAVIS LEE GIBSON,
*Appellant.*

(CC 200005422; SC S48323)

113 P3d 423

Eric Johansen, Deputy Public Defender, Salem, argued the cause and filed the briefs for appellant. With him on the briefs were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Kathleen Mary Cegla, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. With her on the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Laura Anderson and Janet Klapstein, Assistant Attorneys General.

BALMER, J.

**BALMER, J.**

This case is before us on automatic and direct review of defendant's judgment of conviction and sentences of death. Defendant seeks reversal of his convictions for two counts of aggravated murder and his convictions for felony murder, attempted murder, first-degree assault, first-degree robbery, first-degree burglary, and felon in possession of a firearm. Defendant challenges trial court rulings in the pretrial, guilt, and penalty phases of his trial, seeking reversal of his convictions or, in the alternative, vacation of his sentences and remand for resentencing. For the reasons set out below, we affirm the convictions and the sentences, except that we remand to the trial court for the limited purpose of merging defendant's two convictions for aggravated murder and resentencing defendant to only one sentence of death.

## I. FACTS

■     Because the jury found defendant guilty, we review the evidence in the light most favorable to the state. *State v. Thompson*, 328 Or 248, 250, 971 P2d 879, *cert den*, 527 US 1042 (1999).

Defendant attended a party at his cousin's house in Eugene at about 1:00 a.m. on March 12, 2000. There, defendant encountered Wendy Gates, James Herlong, and Deon Givens. Gates indicated that she knew a man named Joshua Copp who might have money because he sold marijuana. Defendant, Gates, Herlong, and Givens formulated a plan to rob Copp, and defendant agreed to drive them all to Copp's house. Defendant had a .45-caliber pistol with him, and Givens had two handguns, one of which he gave to Herlong.

When they arrived at Copp's house at about 5:00 a.m., defendant and Gates knocked on the door. Copp let them in because he knew Gates and then shut and locked the door. Thirty seconds later, defendant unlocked the door and flashed the porch light as a signal. Givens and Herlong then entered the house, and Gates went outside to the car. Givens, Herlong, and defendant confronted Copp in the hallway and told him to go back to his room, which he did. They then asked Copp where his gun and money were, and Copp told

them that his gun was under the mattress. Defendant took Copp's gun and wallet, and someone taped Copp's hands and his eyes. Copp said that his roommate, Steve Johnson, was in the next bedroom. Herlong and Givens kicked in Johnson's door and asked him where his money was. They taped his hands and searched his room but failed to find anything. Johnson broke loose and tried to escape through the window, but defendant and Givens caught and pistol-whipped him.

After retaping Johnson, defendant, together with Givens and Herlong, took Johnson and Copp into the living room, laid them down on the floor, and kicked and hit them. Someone said, "Let's just smoke them." Defendant said, "Fuck it. Get a pillow. I'm going to shoot them both in the head." When Johnson broke loose again and ran to the door, defendant and Givens shot him five or six times at close range. Johnson fell through the front door of the house and onto the lawn. Givens and Herlong ran outside to the car. Another shot was fired inside the house, after which defendant emerged from the house and returned to the car. Defendant told the others in the car that he thought that he had shot one of the victims in the neck or the shoulder.

From Copp's house, defendant, Givens, and Herlong had taken some scales, a knife, some marijuana, a gun they found underneath Johnson's bed, and $200. Along with Gates, they went back to defendant's house, where they split up the money. When they got there, defendant told his wife, "we just killed two people." Later that day, they learned that only Copp had died. Defendant, Gates, and Herlong decided to go to Reno, and they left Eugene by bus the next morning. In Reno, defendant pawned the weapon that he had used during the robbery and shootings. He subsequently returned to Eugene, where he was arrested.

The state charged defendant with the crimes enumerated above, and a jury convicted defendant of all counts. At a separate penalty-phase proceeding on the two counts of aggravated murder, the jury affirmatively answered the four questions set out under ORS 163.150(1)(b). Pursuant to ORS 163.150(1)(f), the trial court entered a sentence of death on each of the aggravated murder counts.

Defendant raises 34 assignments of error. We have examined each of those assignments of error, and we discuss five of them below. We reject all but the assignment challenging the trial court's decision to enter two separate convictions for aggravated murder and two separate sentences of death.

## II.   EVIDENCE OF DEFENDANT'S "OTHER BAD ACTS"

In four assignments of error, defendant challenges the trial court's rulings that allowed evidence of what defendant describes as his "other bad acts." Those acts included defendant's earlier firing of the murder weapon when defendant and Herlong had considered robbing a sandwich shop and a conversation on the bus to Reno in which defendant suggested to Gates that she prostitute herself to make money for the group. We discuss in detail the context in which the trial court made the disputed rulings and the evidence at issue, because that context helps to explain defendant's arguments and our analysis. We then consider defendant's legal arguments.

### A.   *Context at Trial*

#### 1.   *State's Direct Case*

The key issue at trial was whether defendant or Herlong shot Copp. The state sought to prove that defendant was the shooter by introducing evidence that defendant had been the only person in the house with Copp when Copp was shot, that defendant had been armed with the murder weapon during the crime, that defendant had owned the murder weapon, and that defendant had been the leader of the group and therefore the one most likely to have shot Copp. Although no witness testified to seeing defendant shoot Copp, several witnesses testified that defendant had been the only person inside the house with Copp when they had heard a shot. No witnesses testified to seeing Copp alive after they heard the shot. The state's witnesses also testified that ballistics tests showed that Copp had been shot with the .45-caliber pistol that defendant owned, that defendant had carried that pistol when he and the others had entered Copp's house, and that defendant had pawned the pistol in Reno following the murder.

Herlong testified that he had seen defendant fire the gun at least once before. On one such occasion, in the week preceding the murder, Herlong saw defendant fire the gun through an open car window and say, "I feel like killing somebody." Defendant did not object to that testimony. The state submitted an offer of proof in which Herlong testified to the full circumstances surrounding the incident—that the incident had occurred on the same day that Herlong and defendant had gone to a sandwich shop planning to rob it and that defendant also had fired the pistol into the back door of the sandwich shop. However, that evidence was not presented to the jury at that time.

Gates testified about the events that had occurred on the night of the murder and about the subsequent trip to Reno. When the state began to question her about whether defendant had suggested, during the the trip to Reno, that she prostitute herself to make money for the group, defendant objected that any testimony regarding that incident was irrelevant and overly prejudicial. The trial court ruled that that evidence had "some limited relevance" but sustained that objection because "[i]t's taking us too far afield for reasons that aren't going to give us enough to make that trip worthwhile."

2. *Defendant's Direct Case*

In defendant's direct testimony, he presented himself as a passive participant in the crimes. He stated that his wife had purchased the murder weapon and that he never had fired it. He testified that he just "went along with" the planning and execution of the Copp robbery and that he had tried to stop Herlong and Givens from harming the victims. He claimed that he had loaned Herlong the murder weapon on the night of the murder, that he had not been armed at the crime scene, and that Herlong had carried the murder weapon during the robbery. He testified that Herlong, not he, had been the last robber in the house; that, after the murder, he had tried to give the robbery proceeds to the others who were involved and to distance himself from them; and that Herlong and Gates had wanted to go to Reno after the murder and defendant merely had "help[ed them] out." Defendant also repeatedly denied having been the leader of the group.

On cross-examination, the state sought to question defendant about whether he ever had fired the murder weapon and about the prostitution discussion. First, the state asked defendant about Herlong's testimony that defendant had fired the gun before:

> "A.  No, that did not happen. I've never fired that gun before.
>
> "Q.  Never?
>
> "A.  No, I have not fired that gun before."

The state then questioned defendant about the events following the murder, including the trip to Reno. The state asked defendant whether he had asked Gates "to do anything in Reno to make money." He denied any such conversation, and stated, "I never asked her to do anything for money for me."

At that point, defendant objected that the state's questions were "not relevant impeachment." The state responded that its questions regarding the prostitution incident were relevant, in part to rebut defendant's denial of a leadership role. The state also sought to ask additional questions regarding the shooting of the gun at the sandwich shop. Defendant objected to both lines of questioning.

The trial court overruled defendant's objections, reasoning that

> "[t]he jurors are being asked by virtue of the defendant's testimony to conclude that he basically was a more or less accidental and somewhat inconsequential participant here, at least to the extent that he wants everybody to believe that the guns were in the hands of others and that he was not really the leader.
>
> "When asked * * * if he was in charge, he said no. When asked if he was in the leadership role, he said no. And so in my estimation it would be reasonable for the [s]tate to be able to prove that on other occasions involving these same individuals that he was involved and that he was in a leadership position. And I think that the questions put to [defendant] himself and his answers make that relevant."

On further cross-examination after the trial court's ruling, defendant denied that he had fired the gun through

the car window as Herlong had described, again denied ever firing the gun, and asserted that Herlong had initiated the idea of robbing the sandwich shop and had fired the gun at the sandwich shop door:

"Q.  Let's go back to the question I asked you earlier. Have you ever fired that .45 before this night?

"A.  No, I have not fired that .45.

"Q.  I thought you said you fired it out the window.

"A.  No, I didn't tell you I fired it out the window.

"Q.  You never fired it into the door of a restaurant?

"A.  No, I didn't. I was present when that gun was fired at the door of the restaurant.

"Q.  Tell us about that.

"A.  I was given the safe code for a restaurant, and I was going to go over there and see what was in it. I went over there. James Herlong wanted to come along with me. I got there and there was lights on. And I said, 'Let's wait.' It was, I don't know, it wasn't that late. I said, 'Let's leave it alone for now. It will be there.'

"* * * * *

"* * * He said, 'Come on, * * * I think we can do this.' I said, 'All right, come on, let's go. Let's just do it.' I had the gun. We went back over there. He said, 'Let's shoot the door open.' I said, 'Man, this is West 11th' * * *. He said, 'I'll do it.' I said, 'Come on.' He said, 'All right, I'll do it.' And he shot the door a couple times. He ran back to my car and—

"Q.  So you gave him the gun?

"A.  Yeah."

In response to further questions, defendant denied that he ever had "taken a leadership role" in other "criminal behavior" with Herlong or Givens.

### 3. State's Rebuttal Case

The state recalled Herlong and Gates as rebuttal witnesses to rebut defendant's assertions that he never had fired the murder weapon; that Herlong, rather than defendant, had initiated the discussions about robbing the sandwich shop; and that Herlong and Gates had initiated the discussions about Gates's possible prostitution. Defendant objected to the additional questions on the basis of OEC 404 and because the testimony "introduce[d] evidence of other wrongful acts." The trial court allowed the testimony over defendant's objections.

Herlong testified that defendant had fired the murder weapon into the back door of the sandwich shop and that defendant had been "teaching [him] the ropes" on how to commit robbery. Herlong and Gates both testified that defendant had suggested the plan for Gates to earn money through prostitution in Reno.

### B. Defendant's Legal Arguments

On appeal, defendant assigns error to the trial court rulings allowing the state's questioning of defendant regarding the sandwich shop incident and the prostitution conversation, allowing Herlong to testify on rebuttal about the sandwich shop incident, and allowing Herlong and Gates to testify on rebuttal about the prostitution conversation.[1]

Defendant's legal arguments on appeal are not delineated clearly, but he appears to argue that evidence of the sandwich shop incident and the prostitution conversation was inadmissible because (1) it was not relevant; (2) it was evidence of other bad acts that was inadmissible under OEC 404(3); and (3) even if the evidence was relevant and was admissible under OEC 404(3), it should have been excluded under OEC 403 because the danger of unfair prejudice substantially outweighed the probative value of that evidence.[2] We consider defendant's arguments in that sequence.

---

[1] An additional assignment of error concerns the trial court's denial of defendant's motion for a mistrial on the ground that the trial court allowed the state to question defendant about those incidents. That assignment fails because, as described below, the underlying objections are not well taken.

[2] Ordinarily, this court considers whether evidence of a defendant's "other crimes, wrongs, or acts" is admissible for a noncharacter purpose under the

■ ■    Defendant first argues that the rebuttal evidence described above "was not relevant to any material issue in the case." OEC 401 provides the standard for determining whether evidence is relevant. It states:

> " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

OEC 401 establishes a "very low threshold" for the admission of evidence. *State v. Barone*, 329 Or 210, 238, 986 P2d 5 (1999), *cert den*, 528 US 1086 (2000). Evidence is relevant "so long as it increases or decreases, even slightly, the probability of the existence of a fact that is of consequence to the determination of the action." *Id.* We review the trial court's rulings regarding the relevance of evidence for errors of law. *State v. Titus*, 328 Or 475, 482, 982 P2d 1133 (1999) (noting that evidence "either is relevant or it is not").

Defendant argues that the sandwich shop incident and the prostitution conversations were "not relevant to any material issue in the case" and served only "to portray defendant as a criminal." The state responds that this evidence was relevant to rebut defendant's assertions that he was a passive participant in the crime and that Herlong, rather than defendant, shot Copp. According to the state, the evidence instead tended to make more probable the facts that defendant was the person who shot Copp and that defendant played a "leadership role" in the killing of Copp and its aftermath, including the trip to Reno.

■    As to the sandwich shop incident, we agree with the state that defendant's and Herlong's testimony was relevant. This case turned on the identity of the shooter. The state's

---

three-part test set forth in *State v. Johnson*, 313 Or 189, 195, 832 P2d 443 (1992). Under that test, evidence of such acts is admissible if (1) it is independently relevant for a noncharacter purpose; (2) the proponent of the evidence offers sufficient proof that the conduct occurred and that the defendant engaged in it; and (3) the probative value of the conduct is not substantially outweighed by the dangers of prejudice identified in OEC 403. *Id.* at 195. Defendant's legal arguments, while not phrased in terms of the *Johnson* test, present substantially the same issues as the first and third parts of that test. We consider the arguments in the form that defendant has raised them here, but the result would not be different if defendant had structured his arguments more consistently with *Johnson*.

witnesses testified that defendant had initiated and led the commission of the charged crimes and that he had shot Copp. Defendant's theory of the case was that Herlong was the leader on the night of the murder, that Herlong had carried the murder weapon, and that Herlong had shot Copp. When defendant denied that he ever had fired the murder weapon, Herlong's testimony about the facts and circumstances of defendant's earlier possession and firing of that weapon unquestionably had some "tendency" to make "more probable" the existence of a fact of consequence to the case— namely, that defendant shot Copp. Defendant simply is wrong in asserting that that evidence had no relevance to the central facts of the case other than to portray defendant as committing "other bad acts." Herlong's testimony that he had seen defendant carry and fire the murder weapon several days before the murder was relevant. We discuss below the different question whether that evidence should have been excluded for some other reason.

■     We reach a different conclusion regarding the evidence of the prostitution conversation. Defendant argues that that evidence had no purpose other than to show defendant in a bad light and that it was not relevant to any material issue in the case. The state responds that defendant's suggestion to Gates that she engage in prostitution in Reno to support the group is additional evidence of his leadership role in committing the crime and that the jury could infer from that leadership role that defendant had shot Copp.

In our view, no such inference reasonably can be drawn. In contrast to the evidence of defendant's earlier firing of the murder weapon, which directly involved the central issue in the case, the relevance of the prostitution episode depends entirely upon the state's "leadership" theory. Indeed, its relevance depends, first, on the inference that defendant's comment to Gates about prostituting herself tended to show that defendant was the leader of the group, and, second, on the inference that the leader was more likely than one of the followers to be the shooter.

Both of those inferences are questionable. The state was entitled to—and did—introduce evidence tending to show that defendant played a leadership role in the robbery

and shootings and to rebut defendant's claim that he was only a passive participant. However, defendant's prostitution suggestion came *after* the charged crimes were committed, while the group was traveling to Reno. That brief suggestion bears only a tenuous connection with the state's leadership theory, and an even weaker connection with the ultimate issue of whether defendant shot Copp. Certainly, some "leaders" of criminal episodes may be more likely to do the shooting, but other, perhaps more astute, leaders convince others to do so. Moreover, while the state's "leadership" theory regarding Herlong and the sandwich shop incident showed that defendant had suggested that he and Herlong commit a violent crime and that defendant had carried and fired the murder weapon, the prostitution suggestion bears little resemblance to defendant's leadership role in the sandwich shop matter. We disagree with the trial court that defendant's prostitution conversation with Gates had any tendency to prove that defendant was more likely than Herlong to have shot Copp, and we therefore conclude that that evidence was not relevant and should not have been admitted. We discuss below the consequences of that trial court error.

Having concluded that the evidence regarding the sandwich shop incident was relevant (while the evidence regarding the prostitution conversation was not), we turn to defendant's other arguments for the exclusion of the sandwich shop evidence.

■ Defendant argues that, even if the evidence of the sandwich shop incident was relevant, it should have been excluded because it was evidence of a "collateral bad act" that was inadmissible under OEC 404(3).[3] That rule provides:

> "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

---

[3] In 1997, the legislature enacted OEC 404(4), which makes admissible in criminal actions relevant "evidence of other crimes, wrongs or acts by the defendant." Or Laws 1997, ch 313, § 29. Neither party raised or discussed OEC 404(4), and we do not address its applicability here.

The short answer to defendant's assertion is that the evidence that defendant fired the murder weapon during the sandwich shop incident was *not* introduced to "prove [defendant's] character * * * in order to show that [defendant] acted in conformity therewith." Rather, as discussed above, the evidence that defendant previously had carried and fired the murder weapon while he and Herlong planned a violent crime, and the circumstances in which he did so, were independently relevant to the issue of whether defendant or Herlong had shot Copp.

In *Barone*, 329 Or 210, the defendant argued that OEC 404(3) barred the admission of evidence that, earlier on the night of the charged murder, he had threatened a woman with a handgun that resembled the murder weapon. This court held that the testimony was admitted properly because it "was helpful to the jury's consideration of a number of relevant issues," including the defendant's possession of the murder weapon on the night of the murder. *Id.* at 236. Similarly, the evidence here placed defendant with Herlong in a situation where the two contemplated committing a violent crime less than a week before the charged murder occurred; it placed what would later be the murder weapon—which sometimes defendant claimed not to own—in defendant's possession; and it showed defendant firing that weapon. Each of those facts was independently relevant to the issues in the case.

■  This court consistently has held that a witness may be impeached by evidence that contradicts the witness's testimony on any independently relevant fact, although the witness cannot be impeached as to merely collateral matters. *State v. Burdge*, 295 Or 1, 6 n 3, 664 P2d 1076 (1983). Defendant testified that Herlong asked to use defendant's gun on the night of the murder and that he (defendant) never had fired that gun. The state was entitled to introduce Herlong's contradictory testimony on those matters because it related to the circumstances of the crime and to whether defendant fired the shot that killed Copp.

Defendant makes the related argument that the state's introduction of evidence to impeach his testimony, on cross-examination, that he never had fired the murder

weapon was improper because the state was required to "take his answer." Defendant agrees that the state was permitted to ask defendant whether he previously had fired the murder weapon, but that it could not impeach his testimony by calling Herlong as a rebuttal witness to contradict defendant's denial.

This court noted in *State v. Jones*, 279 Or 55, 62, 871 P2d 867 (1977), that, "[w]hen the attempted impeachment is on a 'collateral matter' and the witness denies making the alleged statement, the party must 'take the answer' and may not then call another witness to testify that the witness to be impeached made such a statement." That common-law rule prevents trial time from being squandered by additional witnesses testifying about collateral issues and limits the risk that "jurors will lose sight of the central historical issues in the case." 1 Edward J. Imwinkelried et al., *Courtroom Criminal Evidence* § 715, 272 (1998).

■      However, as noted above, defendant's argument depends entirely on his assertion that the question of whether he ever had fired the murder weapon was "collateral." As this court pointed out in *Jones*, the bar on the use of extrinsic evidence to impeach a witness applies only to impeachment on a "collateral matter." *Jones*, 279 Or at 62. The test of whether a fact inquired of during cross-examination is collateral "is whether the cross-examining party would have been entitled to prove it as a part of and tending to establish its case." *State v. Johnson*, 277 Or 45, 48, 559 P2d 496 (1977); *see also* Imwinkelried at 273 (fact is not "collateral" if "the fact is logically relevant to the historical, material facts in issue under [FRE] 401, [substantially identical to OEC 401]").

As discussed in detail above, however, the facts that defendant owned the murder weapon and had carried and fired it several days earlier when he and Herlong contemplated a robbery were directly relevant to the issue of whether Herlong or defendant shot Copp. The state would have been entitled to prove it as a part of and tending to establish its case. Defendant's earlier firing of the murder weapon was not a "collateral matter."

Defendant also argues that the trial court erred in allowing the state to introduce impeachment evidence, because his testimony was "not precise enough to be impeachable." Defendant relies on *State v. Hayes*, 117 Or App 202, 843 P2d 948, *rev den*, 316 Or 528 (1993), in which the Court of Appeals held that the trial court erred in permitting the state to introduce evidence to rebut the defendant's ambiguous testimony. In *Hayes*, the defendant in a sexual abuse case was asked whether he had ever "[been] mean to" his granddaughter, the victim. He responded, "I've never been mean to any of my kids. My grandkids or my kids, never, neither one. No, sir." *Id.* at 204. The state then impeached the defendant's statement by calling two of the defendant's daughters and two other granddaughters to testify that the defendant had abused them sexually. *Id.* The Court of Appeals reversed, holding that the defendant's denial that he had not been "mean" was not precise enough to be impeached by the testimony proffered by the state. 117 Or App at 206. *Hayes* provides no assistance to defendant. Defendant stated during cross-examination that he "never fired that gun before." Defendant's statement was precise, and Herlong's testimony that defendant had fired the gun that was later used to kill Copp into the back door of the sandwich shop rebutted it.

Finally, defendant argues that, even if the sandwich shop evidence was relevant and was not directed at a collateral matter, it should have been excluded under OEC 403 because its probative value was substantially outweighed by the danger of unfair prejudice. OEC 403 provides:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

"In the context of OEC 403, 'unfair prejudice' means an undue tendency to suggest decisions on an improper basis, commonly although not always an emotional one." *State v. Moore*, 324 Or 396, 407-08, 927 P2d 1073 (1996) (internal quotations omitted). We review a trial court's decision under OEC 403 for an abuse of discretion. *Id.* at 407.

Defendant argues that the evidence showing that defendant and Herlong contemplated robbing the sandwich shop and that (according to Herlong) defendant fired a shot into the back door of the sandwich shop was unfairly prejudicial to defendant because it portrayed him as a criminal. The state responds that the trial court did not abuse its discretion in admitting the evidence because its probative value in showing that defendant was the leader in a prior incident involving both Herlong and the murder weapon and that defendant had fired the murder weapon during that incident outweighed any prejudice to defendant.

■ We agree that the trial court did not abuse its discretion in admitting the evidence. It is true that the evidence of the contemplated robbery and defendant's unprovoked firing of the gun had some potential to cause the jury to view defendant in a bad light. However, the potential for unfair prejudice to defendant from that evidence was limited. Defendant already had testified on his own behalf and had admitted to participation on the night of the murder in criminal activity that was far more serious than the sandwich shop incident. Herlong already had testified, without objection, that during the week before the murder, defendant had fired the murder weapon through a car window and said that he felt like killing someone. Moreover, the sandwich shop incident demonstrated defendant's possession and use of the murder weapon itself in a context of potential criminal activity with Herlong—evidence probative of facts that the state was required to prove at trial.

We have concluded that the trial court properly allowed cross-examination and rebuttal testimony regarding defendant's previous firing of the murder weapon but that it should not have allowed the cross-examination of defendant or the rebuttal testimony of Gates and Herlong as to the prostitution discussion. We now turn to the issue of whether that error was prejudicial.

■ ■ OEC 103(1) provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected * * *." A criminal defendant who assigns error to the exclusion or admission of evidence "must establish that the error was not harmless."

*State v. Lotches*, 331 Or 455, 487, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001). Moreover, Article VII (Amended), section 3, requires an appellate court to affirm a conviction, notwithstanding any evidentiary error, if there is little likelihood that the error affected the verdict. *State v. Davis*, 336 Or 19, 33, 77 P3d 1111 (2003). The appellate court must focus "on the possible influence of the error on the verdict rendered, not whether this court, sitting as a fact-finder, would regard the evidence of guilt as substantial and compelling." *Id.* at 32. That inquiry requires us to examine the nature of the error that occurred below and the context of that error. *Id.* at 32-34. If the particular issue to which the error pertains has no relationship to the jury's determination of its verdict, then there is little likelihood that the error affected the verdict. *Id.*

Here, the improperly admitted evidence pertained to conversations in which defendant suggested to Gates that she prostitute herself in Reno. Defendant argues that the evidence that defendant committed the crime of "compelling prostitution" was "likely to lead the jury to convict defendant on an improper basis," *viz.*, his bad character and commission of other crimes.

We disagree. First, defendant errs in asserting that the disputed evidence demonstrated that defendant had committed the crime of "compelling prostitution." The comments attributed to defendant amounted only to a suggestion to Gates that she engage in prostitution to make money for the group, and she in fact declined to do so. Second, any adverse inference that the jury might have drawn about defendant's character because of that evidence was undercut by other testimony from multiple witnesses that Gates previously had worked for an "escort service" independently of defendant's involvement. Finally, whether the prostitution evidence was likely to have affected the jury's verdict because it cast defendant in an unfavorable light must be considered in the context of the crimes charged and the trial court record. Here, there is little likelihood that the prostitution evidence had any effect on jury's verdict. This was a prosecution for various murder and attempted murder charges, assault, robbery, burglary, and felon in possession of a firearm. Defendant himself testified that he participated in the robbery of Copp and Johnson, and the testimony of numerous other witnesses

as well as physical evidence supported his admissions. Herlong, Gates, and Johnson testified that defendant carried his .45-caliber handgun during the robbery, and no one disputed that it was in his possession before and after Copp was murdered and Johnson was shot. Ballistics evidence showed that Copp was shot with defendant's gun. Johnson testified that defendant said he was going to kill both him and Copp. Herlong, Gates, and another eyewitness, a neighbor, testified that defendant was the only one of the intruders in the house when they heard the final shot fired. Copp was alive when the others left the house; no one saw Copp alive after that time.

In the context of that evidence as to defendant's role in the murder of Copp and the attempted murder of Johnson, we conclude that there is little likelihood that the trial court's improper admission of the prostitution testimony had any effect on the jury's verdict.

### III. AGGRAVATED MURDER CONVICTION AND SENTENCE OF DEATH

Defendant contends that the trial court erred when it entered two convictions for aggravated murder and two sentences of death for the aggravated murder of Copp. Defendant argues that, under this court's decision in *State v. Barrett*, 331 Or 27, 10 P3d 901 (2000), the state properly may charge a defendant with multiple counts of aggravated murder based on the existence of multiple aggravating factors, *id.* at 31, but, in the event of multiple guilty verdicts on those counts, the trial court should enter only one judgment of conviction for aggravated murder for each victim, which judgment should enumerate each of the separate aggravating factors. *Id.* at 37. Defendant acknowledges that he did not object at trial to the imposition of two aggravated murder convictions and two sentences of death, but argues that this court should review the error because it is apparent on the face of the record. The state concedes that the judgment that the trial court entered is erroneous.

We agree that the trial court erred when it imposed two convictions and two sentences of death for Copp's murder and that that error is apparent on the face of the record. We

remand the case for entry of a corrected judgment of conviction reflecting defendant's guilt on the charges of aggravated murder. The judgment should merge the two convictions for aggravated murder into a single conviction and should enumerate separately the aggravating factors on which the conviction was based. The court then should impose a single sentence of death.

## IV. CONCLUSION

We have considered each of defendant's other assignments of error and each of his supporting arguments. The assignments of error and arguments not discussed in this opinion either have been discussed by this court in previous cases and resolved against defendant, were not preserved for review, or are not well taken. Further discussion of the issues would not benefit defendant, the public, the bench, or the Bar.

The judgment of conviction and the sentences, including the sentences of death, are affirmed in part and reversed in part. The case is remanded to the circuit court for further proceedings.