Argued and submitted October 13, 2015, affirmed June 7, petition for review
denied November 28, 2017 (362 Or 208)

## GREGORY THOMAS SAKO,
*Petitioner-Appellant,*

*v.*

## Jeri TAYLOR,
Superintendent,
Two Rivers Correctional Institution,
*Defendant-Respondent.*

Umatilla County Circuit Court
CV130613; A155885

398 P3d 350

Matthew G. McHenry argued the cause for appellant.
With him on the briefs was Michael R. Levine.

David B. Thompson, Assistant Attorney General, argued
the cause for respondent. With him on the brief were Ellen F.
Rosenblum, Attorney General, and Anna M. Joyce, Solicitor
General.

Before Sercombe, Presiding Judge, and Hadlock, Chief
Judge, and Tookey, Judge.*

---

* Hadlock, C. J., *vice* Nakamoto, J. pro tempore.

### SERCOMBE, P. J.

Petitioner appeals a judgment denying his petition for post-conviction relief from his convictions for first-degree rape, ORS 163.375, and first-degree sexual abuse, ORS 163.427. In the petition, petitioner alleged, among other things, that he was denied constitutionally effective and adequate assistance of trial counsel. In his first assignment of error, petitioner contends that the post-conviction court erred when it concluded that petitioner was not denied adequate assistance of counsel based on its determination that four instances of deficient performance by trial counsel did not prejudice petitioner. We write to address two of those instances, and we conclude that the post-conviction court did not err in determining that petitioner was not prejudiced by trial counsel's deficient performance in (1) failing to seek or obtain medical records from the victim's personal physician and (2) withdrawing a successful motion to suppress.[1] Accordingly, we affirm.

"We are bound by the post-conviction court's factual findings to the extent they are supported by evidence in the record." *Tracy v. Nooth*, 252 Or App 163, 165, 285 P3d 745 (2012), *adh'd to on recons*, 255 Or App 435, 299 P3d 565, *rev den*, 353 Or 868 (2013). We state the facts consistently with that standard.

The underlying criminal charges arose under the following circumstances. Petitioner was charged with first-degree rape, first-degree kidnapping, second-degree kidnapping, and first-degree sexual abuse for an incident that took place in his room at a fraternity house during a Halloween party in October 2008. The victim, dressed in a costume, went to the party with two of her friends after spending time at one of their homes where she consumed some alcoholic beverages; she had also taken Cymbalta, a medication that had been prescribed to her. Partygoers danced in the basement of the fraternity house; the victim danced with and kissed petitioner. Petitioner, who was wearing a green beer bottle costume, appeared to be intoxicated throughout

---

[1] We reject without discussion the additional grounds on which petitioner seeks relief in his first assignment of error, as well as petitioner's second and third assignments of error.

the evening and had hash marks drawn on his arm to represent the number of drinks that he had consumed.

The victim's friends left the basement and went upstairs, and, shortly thereafter, the victim asked petitioner to help her find them. They looked on the main floor of the house and eventually went to the room that petitioner shared with another fraternity member, which was located off of a busy hallway that had heavy foot traffic during the party because it was the route to the bathroom. The walls of the room were thin and the room was not soundproofed in any way. Petitioner and the victim sat on a futon and kissed, which was consensual. The victim testified at the criminal trial that petitioner had asked her to have sex with him and she said no because she had just met him.

Two fraternity members, Frenkel and Henes, testified that they each, separately, came into the room while petitioner and the victim were there and saw them on the futon. According to the victim, she got up and said that she wanted to leave, but petitioner told her that she "shouldn't leave," grabbed her wrists, pulled her onto the futon, pushed her onto her back, and then put his forearm over her chest and held her down.[2] She testified that she had told him to stop but that he had pulled up her costume, pulled her underwear to the side, and forced himself inside her with his penis. She testified that she again had told him to stop but he did not. She remembered crying and that "it hurt extremely bad." Blood soaked through her underwear and stained her costume, petitioner's underwear, and the sheet covering the futon. The victim testified that she "eventually got up, and he sat up and he asked [her] to give him a blow job," which she refused. She then got up, walked to the door, and left the room; petitioner followed right behind her. Witnesses confirmed that they came out of the room together and that both were wearing their costumes.

The victim testified that, upon leaving petitioner's room, she immediately went downstairs, where she found

---

[2] During cross-examination, the victim admitted that she did not remember certain details about the encounter and also acknowledged that her testimony at trial was the first time she had mentioned that petitioner held her down with his forearm. She also acknowledged that she had not told the police officers about kissing petitioner.

her friends. One of them asked her what was wrong, and she replied, "I think I was raped." Both friends noticed blood on her costume, and one of them testified that the victim "looked shocked and dazed." The victim and her two friends left the party.

There was testimony at the jury trial that conflicted with the victim's account of her exit from petitioner's room. Three witnesses—Long, Frenkel, and Scheid—testified that they were in the hall talking outside petitioner's door when petitioner and the victim left the room. No one heard anything from the room before petitioner and the victim came out. Frenkel saw the victim adjust the top of her dress; he asked petitioner in a whisper whether anything had happened, and petitioner replied, "No, nothing happened." Petitioner and the victim joined the conversation briefly; the victim did not appear upset, her makeup was not smudged, and she did not look like she had been crying. Long joked about whether petitioner was wearing underwear under his beer bottle costume and lifted up the front of the costume. When he did so, Long, Frenkel, and Scheid noticed blood on petitioner's underwear. Scheid thought that the spot might have been menstrual blood from the victim. Those three then went across the hall into Frenkel's room with petitioner and asked him what had happened. Petitioner told them that the victim was on top of him and that they had been making out, and that was all. When the group came out of Frenkel's room, the victim was no longer in the hallway.

Later that night, the victim went to the emergency room at the hospital and was examined by a doctor and by a nurse, who performed a rape kit. The examination revealed dried blood and two small tears in the victim's vaginal wall but no deep lacerations or active bleeding. The doctor found some signs that could be consistent with penetration of the vagina but saw no other signs of trauma, such as bruising, typically associated with sexual assault. There was no evidence of menstrual bleeding. At trial, no evidence was presented that linked any of the rape kit collections to petitioner.[3]

---

[3] The rape kit included the collection of eight cervical and vaginal swabs; a forensic scientist who testified for the prosecution did not detect any seminal fluid or spermatozoa on the swabs.

The victim reported to the doctor that she could not remember what had happened and could not say whether there had been anal, oral, or vaginal intercourse. The doctor opined at trial that the victim's inability to recall what had happened was consistent with shock.

The victim also spoke to a police officer while she was at the hospital. The officer and the doctor both testified at trial that the victim did not show any signs of intoxication; the doctor did not see any reason to order a toxicology test and did not do so. At trial, the victim testified that her prescription medication, Cymbalta, never had any effect on her when she drank alcohol. She also testified that Cymbalta is an antidepressant and a muscle relaxant and that she took it as a muscle relaxant "for a chronic back injury that [she] obtained through 13 years of ballet training."

The day after the party, Detectives Posler and Houck went to the fraternity house to find petitioner and to execute a search warrant. The search warrant authorized the detectives to search for, seize, and forensically analyze a black futon and a green beer bottle costume. The detectives also seized petitioner's underwear that had blood on it. When one of the detectives found the bloody underwear, petitioner stated, "I might have fingered her." DNA testing matched the blood on petitioner's underwear and the blood on the futon to the victim's DNA profile.

Petitioner was charged by indictment with, among other things, first-degree rape, ORS 163.375, for "unlawfully and knowingly, by forcible compulsion engag[ing] in sexual intercourse with [the victim]," and with first-degree sexual abuse, ORS 163.427, for "unlawfully and knowingly by means of forcible compulsion subject[ing the victim] to sexual contact by means of forcible compulsion by touching her vagina with [petitioner's] penis, [the victim's] vagina being a sexual or intimate part of [the victim]."[4]

---

[4] ORS 163.375(1) states, in part, that "[a] person who has sexual intercourse with another person commits the crime of rape in the first degree if: (a) [t]he victim is subjected to forcible compulsion by the person[.]" ORS 163.427(1) states, in part, that "[a] person commits the crime of sexual abuse in the first degree when that person: (a) Subjects another person to sexual contact and: *** (B) [t]he victim is subjected to forcible compulsion by the actor[.]"

Prior to the criminal trial, the victim's personal physician, Dr. Crone, was listed on the state's witness list; however, she was ultimately not called to testify as a witness at trial. Petitioner's trial counsel had one document from Crone, which was a letter from Crone to Houck about whether the victim was menstruating at the time of the incident and describing the victim as "a very solid, well grounded young woman." Trial counsel did not consider seeking pretrial production of Crone's medical records regarding the victim; at the time, he did not see the need for any such records.

Also prior to the criminal trial, petitioner's trial counsel filed a motion to suppress, which was granted. The trial court suppressed petitioner's bloody underwear, forensic evidence obtained from the underwear (a DNA test result matching the blood to the victim's DNA profile), and petitioner's statement about putting his finger inside of the victim. However, trial counsel later became concerned about the possible consequences of keeping the suppressed evidence from the jury and consulted with petitioner about his concerns. Petitioner withdrew the motion to suppress at the start of the criminal trial, in part, to pursue one of the defense theories that the blood was the result of digital penetration, and all of the suppressed evidence[5] was admitted into evidence at trial.

At the jury trial, petitioner pursued defense theories that (1) no sexual intercourse took place,[6] or, alternatively, (2) if sexual intercourse did take place, there was no forcible compulsion or lack of consent by the victim. Petitioner's medical expert, who had reviewed the medical records from the victim's emergency room visit, testified that the findings were inconsistent with forcible penetration. He also concluded that it was impossible to tell from the vaginal exam whether penile penetration had occurred.

Ultimately, the jury convicted petitioner of first-degree rape and first-degree sexual abuse. On appeal from

---

[5] The record reflects that a photograph of petitioner's blood-stained underwear was admitted into evidence.

[6] As noted, petitioner was charged with touching the victim's vagina with his penis. He pursued a defense theory that there was no penile penetration of the victim; rather, the blood came from the victim sitting on petitioner's lap or was the result of digital penetration.

the resulting judgment, we affirmed without opinion. *State v. Sako*, 248 Or App 756, 275 P3d 1017 (2012). Petitioner then sought post-conviction relief, alleging in his petition that he was denied effective and adequate assistance of counsel, under the Sixth and Fourteenth Amendments to the United States Constitution and under Article I, section 11, of the Oregon Constitution, because, among other things, trial counsel (1) "[f]ailed to seek and obtain medical and counseling records of the complaining witness * * * prior to trial[,]" and (2) "[a]fter successfully litigating a motion suppressing physical evidence and Petitioner's statements, advised Petitioner to withdraw the motion and allow the evidence to be introduced."

Petitioner argued to the post-conviction court that he was denied adequate and effective assistance of trial counsel because his attorney failed to obtain the medical records of the victim prior to trial. Those records, according to petitioner, would have provided grounds to attack the victim's credibility in three respects: (1) the records—which showed that Crone had prescribed Cymbalta for the victim because of her ongoing depression and anxiety, and did not mention a chronic back injury—provided a basis for impeaching the victim's trial testimony that she took Cymbalta for chronic back pain; (2) the records—which showed that the victim had reported to Crone that she did not consume alcohol—provided another avenue of impeachment by showing that the victim lied to her own physician about her use of alcohol; and (3) based on the records that reflected a worsening of the victim's emotional condition and increased dosage of Cymbalta shortly before the incident, trial counsel could have argued at trial that the victim "was undergoing a mental health crisis at the time of the alleged incident which, combined with the recently-doubled dosage of * * * Cymbalta and the alcohol consumed that evening, may well have altered her perception and/or memory of the events and distorted her thinking."

At the post-conviction trial, petitioner offered Crone's medical records as an exhibit and also called a criminal defense attorney expert to provide her opinion about how those records could have been used at petitioner's criminal trial. The expert testified that a "thorough, diligent,

competent [defense] attorney" in a "sex case" would seek to obtain medical records of a complaining witness. She also testified that she would have attempted to cross-examine the witness using the medical records to, among other things, inquire about the amount of the drug the witness was taking, and also—with the assistance of a pharmacologist to explain the effects of Cymbalta—to inquire about "whether [the witness] was experiencing any of those effects or not given [the attorney expert's] assumption that the interaction with alcohol had some kind of an effect" on the victim.

The post-conviction court determined that trial counsel's failure to request Crone's records was a failure to exercise reasonable professional skill and judgment; however, the court concluded that petitioner had failed to prove that that deficient performance prejudiced him. The court disagreed with petitioner's assessment of the case as a credibility contest between petitioner and the victim because, even though they were the only persons in the room at the time of the incident, there was significant physical evidence to indicate that the incident had occurred and several witnesses confirmed the existence of that evidence. The court acknowledged that "a witness's ability to perceive and recall clearly is always an issue" and that an issue here was whether the victim's "ability to perceive, recall and recount what happened the night of the incident was adversely affected by use of alcohol and Cymbalta." The court stated:

> "[T]here is no record evidence in this proceeding that pretrial disclosure of those records would have tended to affect the result of the trial. The medical expert * * * testified that when she saw [the victim] within hours of the incident, [the victim] showed no clinical signs of intoxication. * * * Police Officer Stahl testified that [the victim] showed no signs of intoxication within a few hours of the incident. * * * There is nothing to the contrary elsewhere in this record. Petitioner has failed to prove prejudice."

Petitioner also argued to the post-conviction court that he was denied adequate and effective assistance of counsel because trial counsel advised petitioner to withdraw a successfully litigated motion to suppress and to allow the suppressed evidence to be admitted. The post-conviction court denied relief on that claim.

Regarding the admission of petitioner's statement that he may have "fingered" the victim, the post-conviction court stated that it "cannot say it was [an] unsound and unreasoned" tactical decision and that "[a]dmitting the statement was not ineffective assistance of counsel"; the court also determined that petitioner was not prejudiced by the admission of the statement. That is, the post-conviction court determined that petitioner's claimed error regarding the admission of petitioner's statement failed on both prongs—*i.e.*, deficient performance and prejudice—of the inadequate assistance of counsel test.[7]

As to the admission of the photograph of petitioner's underwear and the forensic (DNA) evidence from the underwear, the post-conviction court determined that trial counsel's performance was deficient, but that petitioner was not prejudiced by it. The court explained its reasoning as follows:

"The evidence admitted as a result of withdrawal of the motion to suppress placed [the victim] in the petitioner's lap and placed the blood of [the victim] on the underwear petitioner wore at the time.

"However, other legally obtained blood and DNA evidence placed [the victim] in the petitioner's room and on petitioner's futon at the time of the incident.

"Other witnesses saw [the victim] on petitioner's lap and several other witnesses saw petitioner's bloody underwear immediately after petitioner and [the victim] left petitioner's room. The actual bloody underwear when received in evidence did not provide the record with new information.

"The only additional physical evidence added by admitting the bloody underwear into evidence was the DNA result. This Court agrees with the State's assessment that, even without the bloody underwear in evidence, a jury could have reasonably inferred from the record testimony that the blood on [the victim's] costume and on the petitioner's futon (established as [the victim's] blood by DNA

---

[7] Petitioner argues on appeal that the post-conviction court concluded that the admission of the statement was deficient performance. We do not read the court's opinion to reach that conclusion. However, we need not address both prongs of the test because petitioner's claim fails on the prejudice prong.

testing) was the same blood that transferred onto petitioner's underwear and, therefore, that it was [the victim's] blood."

On appeal, we review the post-conviction court's legal conclusions for errors of law. *Tracy*, 252 Or App at 165. "The test for determining whether a petitioner has been denied adequate assistance of counsel, under both the state and federal constitutions, is two-pronged: First, the petitioner must show that his or her counsel performed inadequately. Second, the petitioner must demonstrate that he or she was prejudiced as a result of counsel's error." *Jackson v. Franke*, 284 Or App 1, 3, 392 P3d 328 (2017) (citing *Pereida-Alba v. Coursey*, 356 Or 654, 661-62, 342 P3d 70 (2015); *Strickland v. Washington*, 466 US 668, 686, 104 S Ct 2052, 80 L Ed 2d 674 (1984)). It is petitioner's burden to prove the allegations in his petition by a preponderance of the evidence. ORS 138.620(2).

To prove prejudice under the state constitution, petitioner needed to demonstrate that his trial counsel's deficient performance "had a tendency to affect the result of the prosecution." *Green v. Franke*, 357 Or 301, 321, 350 P3d 188 (2015) (internal quotation marks omitted). As explained by the Supreme Court, "the tendency to affect the outcome standard demands more than mere possibility, but less than probability" of a different outcome of the jury trial. *Id.* at 322. For petitioner to prove prejudice under the federal constitution, he was required to show that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 US at 694.

As an initial matter, we conclude that the post-conviction court correctly determined that the admission of petitioner's statement that he may have "fingered" the victim did not prejudice petitioner "because one interpretation of that evidence advanced a trial strategy that, if believed, could have led to a result favorable to petitioner," and we reject without further discussion petitioner's argument that the admission of the statement caused him prejudice. We consider the remaining claimed errors in turn, beginning with the post-conviction court's conclusion that petitioner

was not prejudiced by trial counsel's failure to make a pre-trial request for the victim's medical records.

On appeal, petitioner asserts that the victim's credibility was critical at trial because the case turned on what happened in petitioner's room when the victim and petitioner were alone. Petitioner argues that the post-conviction court erred in concluding that no prejudice resulted from trial counsel's failure to seek Crone's medical records because, as petitioner argued to the post-conviction court, the records would have provided strong grounds to attack the victim's credibility. In response, the superintendent contends that the post-conviction court correctly concluded that petitioner failed to establish the prejudice necessary to make out an inadequate assistance claim.[8]

We disagree with the post-conviction court's determination that, because of the physical evidence that was available, this case was not a credibility contest between petitioner and the victim. As petitioner correctly points out, the crux of the case was what happened in petitioner's room, and the physical evidence could support either petitioner's or the victim's version of the events. That is, the jury could have believed the victim's account that she was raped, or the jury could have believed petitioner's theory that (1) the encounter was consensual or (2) that he did not penetrate the victim with his penis. Nonetheless, we are not persuaded by petitioner's arguments that the failure of his trial counsel to request the victim's medical records caused him prejudice.

Petitioner contends that the medical records would have provided a basis for impeaching the victim's trial testimony that she took Cymbalta for chronic back pain, when the records indicate that she was taking Cymbalta for anxiety and depression. Therefore, according to petitioner, had trial counsel had the records prior to trial, "he would have possessed powerful, unassailable evidence that the state's chief witness was lying under oath, entirely undermining her credibility." And, in turn, because credibility of the

---

[8] The superintendant notes that, "[a]lthough it is far from clear that the post-conviction court's deficient performance conclusion is correct, the Superintendent will not address that prong of the inadequate-assistance test" because the claim can be disposed of "on the prejudice prong alone."

victim was at the heart of the case, failure to obtain the medical records had a tendency to affect the result of the trial.

The superintendent responds that petitioner faces an absence of proof and insurmountable evidentiary rules: First, petitioner has failed to prove what the victim's response would have been if she was challenged on the reason she gave for her Cymbalta use, and, second, the reason that the victim was taking Cymbalta was not at issue in the trial, and impeachment is not permitted on a collateral matter.

We agree with the superintendent. Putting aside the superintendent's argument that there was a failure of proof on the victim's testimony, the reason *why* the victim was taking Cymbalta was not relevant information for the criminal trial.[9] As the superintendent observes, a witness cannot be impeached on a collateral matter, and the reason why the victim was taking Cymbalta is such a collateral matter. As the superintendent notes, whether the victim was taking Cymbalta and also consuming alcohol at the time of the alleged crimes was an issue at trial because the parties believed that to be relevant to whether the victim's ability to perceive and recall the events may have been impaired. However, the reason for the victim's Cymbalta prescription was not the focus of the parties' inquiries.

The Supreme Court has stated that,

"[u]nder Oregon law, 'a witness may be impeached by evidence that contradicts the witness's testimony on *any independently relevant fact*[.]' *State v. Gibson*, 338 Or 560, 572, 113 P3d 423 (2005) (emphasis added). In a nutshell, that means that a witness 'cannot be impeached as to merely collateral matters.' *Id.* The test of whether a fact is collateral or not is straightforward: the fact is not collateral if '"the cross-examining party would have been entitled to prove it as part of and tending to establish its case."' *Id.* at 573 (quoting *State v. Johnson*, 277 Or 45, 48, 559 P2d 496 (1977))."

___

[9] OEC 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

*State v. Guzek*, 342 Or 345, 359, 153 P3d 101 (2007). Here, the cross-examining party—*i.e.*, petitioner—would not have been entitled to prove that the victim was prescribed Cymbalta for anxiety and depression as part of establishing his defense of consent or no sexual intercourse at the criminal trial. Therefore, the medical records could not have been used to impeach the victim on that collateral matter.

Petitioner next contends that another avenue to impeach the victim's credibility is that the medical records show that she deceived her own physician about her use of alcohol, noting that certain medical records contain a notation that the victim "abstains" from alcohol use, yet the victim testified that she drank alcohol on the night of the party and also that combining Cymbalta and alcohol did not have any effect on her. We are not persuaded by petitioner's argument. First, as discussed above, impeachment of a witness is not permitted on a collateral matter. An issue at trial was whether the victim had consumed alcohol prior to her encounter with petitioner; she testified that she had done so. What the victim may or may not have told her private physician about her alcohol consumption prior to the sexual assault was not an issue at trial and was, therefore, not a proper matter for impeachment.

Additionally, as the superintendent contends, to the extent petitioner argues that the defense could have used the notation in the victim's medical records that she was not drinking alcohol to show that she was lying to her personal physician about that as a means to attack her credibility in general, that argument fails because the rules of evidence would have prohibited that use. OEC 608(2) states:

> "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the credibility of the witness, other than conviction of crime as provided in ORS 40.355, may not be proved by extrinsic evidence. Further, such specific instances of conduct may not, even if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness."

Petitioner would not have been permitted to use the medial records to attempt to show that the victim lied to her

physician as a basis to prove that she is generally not a credible person. Accordingly, we reject that argument.

Petitioner's final argument regarding the medical records is that trial counsel could have used the records as a basis to argue that the victim "was undergoing a mental health crisis at the time of the alleged incident which, combined with the recently-doubled dosage of * * * Cymbalta and the alcohol consumed that evening, may well have altered her perception and/or memory of the events and distorted her thinking." We understand petitioner's argument to be that the victim's depression and anxiety noted in the medical records—in combination with the use of alcohol and Cymbalta—could have affected the victim's ability to accurately perceive or remember the events on the night in question.

The failure to discover the victim's mental condition would be prejudicial only if the post-conviction relief record showed that petitioner properly could have argued that the mental condition, by itself or in combination with other impairments, could have affected the victim's ability to recall and recount the circumstances of the crimes. No such proof was made. Petitioner's own attorney expert testified at the post-conviction trial that competent counsel should have "probably explore[d] with an expert in pharmacology what the interaction between Cymbalta and alcohol would be and * * * whether there would be some concern there about [the victim's] ability to perceive accurately or to understand fully what was going on." She also testified that, "to the extent that [she] would have been able with the assistance of a pharmacologist to—to describe the effects, [she] could've cross-examined [the victim] on—on whether [the victim] was experiencing any of those effects or not given [her] assumption that the interaction with alcohol had some kind of effect." That is, petitioner's own expert recognized the need for a pharmacology expert to provide information about any side effects of using Cymbalta and the effects, if any, of the interaction between Cymbalta and alcohol. However, petitioner did not provide such evidence at the post-conviction trial. Petitioner merely speculates that the anxiety and depression noted in the victim's medical

records along with the Cymbalta and alcohol might have caused the victim to have impaired perception, memory, or distorted thinking.

Petitioner failed to prove by a preponderance of the evidence that his attorney's deficient performance in not obtaining the medical records had a tendency to affect the verdict.

We turn next to the withdrawal of the successful motion to suppress. As noted above, evidence that had been suppressed—petitioner's statement about putting his finger inside of the victim, a photograph of petitioner's bloody underwear, and forensic evidence obtained from the underwear (a DNA test result matching the blood to the victim's DNA profile)—was admitted into evidence after petitioner withdrew his motion to suppress. The post-conviction court stated that "[i]t is clear that trial counsel's decision [to withdraw the successfully litigated motion to suppress] was made as a part of a deliberate trial strategy." However, the court also acknowledged that "the fact that a lawyer has made a 'tactical decision' does not mean that the lawyer's choice meets the constitutional standard for adequate assistance of counsel." *Stevens v. State of Oregon*, 322 Or 101, 109, 902 P2d 1137 (1995).

On appeal, petitioner argues that the post-conviction court erred in denying relief because he was prejudiced by the admission of the photograph of the underwear and DNA evidence. He argues that the admission of that evidence had a tendency to affect the outcome of the jury trial because the jury was allowed to view the blood-stained underwear and consider additional DNA evidence. The superintendent argues that the post-conviction court's analysis is compelling, and its conclusion that there was no prejudice is correct.

As noted above, the post-conviction court stated that the "bloody underwear when received in evidence did not provide the record with new information." We agree with the post-conviction court. Two witnesses testified at trial that they saw petitioner and the victim on the futon in petitioner's room, and three witnesses testified that they saw blood on petitioner's underwear after he came out of

his room with the victim. Those three witnesses also testified that they had questioned petitioner about what had happened; petitioner explained to them that he and the victim had been making out and that the victim was on top of him. Given that evidence, the admission of the photograph of petitioner's blood-stained underwear itself did not provide new information to the jury.

Petitioner contends that he was prejudiced because trial counsel's error in withdrawing the motion to suppress allowed the jury to view the underwear, which was misleading. In his view, it is one thing for a jury to hear testimony about blood-stained underwear from a witness, but another thing entirely to view a photograph of the actual underwear. The testimony of Long at the criminal trial was that there was a quarter-sized spot of blood on the underwear near the waistband. However, petitioner argues, the photograph of the underwear that was admitted at trial did not match that description; the blood stain in the photo is larger and not just near the waistband. Long's testimony at the jury trial was that the blood pattern on the underwear in the photograph looked different than when he saw it in the hallway. Therefore, according to petitioner, by admitting the evidence, the jury was presented with a misleading and exaggerated view of what the underwear actually looked like immediately after the incident.

We are not persuaded by petitioner's argument that the appearance of the blood stain on the underwear misled the jury and had a tendency to affect the verdict. Petitioner does not explain why the *appearance* of the stain would make a difference to the jury—that is, he does not identify why the jury would have been more likely to convict petitioner as a result of seeing a photograph of the stain as opposed to only hearing about the stain from several witnesses. Therefore, we reject that argument.

Finally, the admission of the photograph of petitioner's blood-stained underwear was not inconsistent with petitioner's defense theories, which were that there was either no penile penetration—but that there could have been digital penetration—or that the encounter was consensual. Indeed, having blood on his underwear is consistent with

his account, as told to others at the party, of the victim being on top of him while they were making out. Petitioner does not explain why the admission of evidence that corresponded with his version of the incident would have had a tendency to affect the verdict, and we see no reason why it would. For all of those reasons, we conclude that the admission of petitioner's underwear did not prejudice petitioner.

Petitioner also argues that trial counsel's deficient performance allowed the state to put on additional DNA evidence, which tended to affect the result of the prosecution. Petitioner argues that DNA evidence is very powerful evidence that has an aura of infallibility surrounding it, and, because of that perceived infallibility and DNA's concomitant correlation to guilt in a juror's mind, the DNA evidence admitted due to trial counsel's error tended to affect the result of the prosecution. This is particularly true, according to petitioner, because the prosecutor emphasized the DNA evidence during his closing argument, stating that the victim's DNA came from blood on petitioner's underwear and that, "[Y]ou heard expert testimony from the DNA scientist * * * and she said the mathematical statistics of that not being her blood was one in ten billion." Indeed, the Supreme Court has recognized that "[e]vidence perceived by lay jurors to be scientific in nature possesses an unusually high degree of persuasive power." *State v. O'Key*, 321 Or 285, 291, 899 P2d 663 (1995) (considering the admissibility of horizontal gaze nystagmus test evidence in prosecution for driving under the influence of intoxicants).

However, we are not persuaded that the DNA evidence from petitioner's underwear had such a powerful effect here that it would have had a tendency to affect the result of the trial. As the post-conviction court noted, the jury was presented with other DNA evidence linking petitioner to the victim's blood—*i.e.*, DNA from the victim's blood found on petitioner's futon. There was also other evidence that the victim was bleeding—there was blood on the victim's costume and on her own underwear. Thus, the DNA evidence on petitioner's underwear was *additional* physical evidence linking him to the victim's blood.

In short, the admission of the DNA test result did not add much to the record. Other evidence that was admitted

included testimony of witnesses that placed the victim and petitioner together in petitioner's room and coming out of his room together, testimony of witnesses who saw blood on petitioner's underwear, and testimony of witnesses who spoke to petitioner after seeing the blood on his underwear and who were told by him that the victim was on top of him and they were making out.

Moreover, petitioner does not explain why a DNA test result identifying the blood on petitioner's underwear as the victim's blood made it more likely that the jury believed the victim's version of the incident over the defense theories. The jury could have concluded that the blood was the victim's and, at the same time, could have believed petitioner's defense theory that her blood ended up on his underwear because the victim was on top of him or because he digitally penetrated her. Therefore, under the facts of this case and the defense theories argued to the jury, we conclude that the admission of the DNA test result did not prejudice petitioner.

We are not persuaded that the admission of a photograph of petitioner's underwear and the DNA evidence from the blood on the underwear had a tendency to affect the outcome of the prosecution. Therefore, the post-conviction court did not err in concluding that petitioner was not prejudiced by the withdrawal of the motion to suppress and the subsequent admission of that evidence.

Affirmed.