Argued and submitted September 9, 2020, affirmed December 29, 2022

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHAEL HENRY FORKER,
*Defendant-Appellant.*

Washington County Circuit Court
17CR69999; A169208

523 P3d 670

Defendant appeals from his conviction on nine counts of various sexual offenses, raising seven assignments of error. In his first assignment of error, defendant challenges the trial court's denial of his motion to suppress evidence seized from his apartment years earlier on the ground that the state possessed that evidence unlawfully. Pursuant to a plea agreement in an earlier case, defendant had relinquished his interest in the items. The trial court in that case had ordered the items to be destroyed, but the state never destroyed them. In his second through sixth assignments of error, defendant challenges the trial court's decision to admit a range of items, contending that the trial court abused its discretion under OEC 403 in determining that the items' probative value was not substantially outweighed by the danger of unfair prejudice. Finally, in his seventh assignment of error, defendant asserts that the trial court erred under OEC 401 when it excluded as irrelevant printouts of Facebook postings that defendant sought to offer as impeachment evidence. *Held*: Defendant's concession below that the destruction order was not a bargained-for part of his plea agreement precludes him from prevailing on his appellate challenge to the denial of his motion to suppress. Furthermore, the court's decision to admit the challenged evidence was within the range of permissible options available to it in the exercise of the broad discretion conferred on trial courts under OEC 403. Finally, the exclusion of the Facebook printouts, even if erroneous, was harmless.

Affirmed.

Ricardo J. Menchaca, Judge.

David O. Ferry, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

David B. Thompson, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before James, Presiding Judge, and Lagesen, Chief Judge, and Kamins, Judge.

LAGESEN, C. J.

Affirmed.

James, P. J., dissenting.

**LAGESEN, C. J.**

A jury convicted defendant of nine felony sex offenses: one count of sexual abuse in the first degree, ORS 163.427 (Count 1); three counts of sodomy in the first degree, ORS 163.405 (Counts 2, 5, and 8); and five counts of sexual abuse in the second degree, ORS 163.425 (Counts 3, 4, 6, 7, and 9). Defendant committed the offenses in 2002, when the victim, C, was 14 and 15, but C did not report defendant to law enforcement until he was 29.

On appeal, defendant raises seven assignments of error in which he challenges the trial court's denial of his motion to suppress, its decision to admit certain evidence, and its decision to exclude certain extrinsic evidence offered for impeachment purposes. The primary issue on appeal is whether Article I, section 9, of the Oregon Constitution requires suppression of evidence seized during a 2003 search of defendant's apartment pursuant to a warrant where, in connection with a plea agreement, defendant stipulated to relinquishing his interest in the items seized and the trial court, upon accepting that stipulation, ordered the items to be destroyed once they were no longer needed as evidence, but the state never destroyed the items. We affirm.

## I. BACKGROUND

As mentioned, although this case was tried in 2017, the charges stemmed from conduct occurring in 2002 and initially investigated in 2003.

In early 2002, when C was 14, he developed an online relationship with defendant. During that time, C's parents were going through a divorce and were involved in a custody dispute over C and his siblings. While C was staying with his mother under the terms of his parents' visitation order, C's mother kicked him out of the house. C had no place to go because, under the terms of the visitation order, C was supposed to be with his mother not his father, and if he went to his father's house, it could jeopardize his father's ability to get custody, which is what C wanted. After spending a few nights on the street, C contacted defendant online and defendant offered to let C stay with him. C went to defendant's apartment.

The first night C was at defendant's apartment, defendant anally sodomized him while C was sleeping. The next morning, C realized what had happened and told defendant that he needed to leave. Defendant, in response, forcibly sodomized C. Afterwards, he told C that if C "was a good boy and if I played with him he would make sure that I would have a place to stay," but, if C didn't, defendant would drain C's father's bank accounts and would make sure he did not get custody. Defendant then took C to the train station and told C he would be in touch and that he expected C to come when defendant contacted him.

C then went to his dad's house but did not tell his dad what had happened. After that, defendant would contact C by instant messaging and would either pick C up or expect C to take a train to his apartment. On at least eight occasions, he forced C to perform oral sex on him. On at least five occasions, defendant again anally sodomized C. Most of the time, defendant would play pornographic videos, usually of young males. Sometimes he would play VHS videos other times he would play them on his computer.

The abuse went on until the end of 2002, when defendant lost his job. At that point, defendant told C that he "had to leave and that we wouldn't be able to play anymore." Defendant threatened to leak a photo of C that he had taken during one of the acts of abuse if C disclosed the abuse. C was relieved that he wouldn't have to see defendant anymore and hoped at the time he wouldn't have to tell anybody about what had happened.

At the end of 2002, and then again in 2003, defendant sought treatment from Nader, a licensed clinical social worker who treats, among other things, addictions, including pornography addictions. During treatment, defendant made statements about having sexual contact with an underage person. Nader called the child abuse reporting hotline to report defendant's disclosures.

The Department of Human Services (DHS), in turn, notified Detective Vandehey of the child abuse unit of the Washington County Sheriff's Office of Nader's report, including C's first name.

Based on that information, Vandehey obtained a search warrant for defendant's apartment. The search uncovered a number of pornographic materials, including videos, involving children; those were seized. Two computers, containing a total of three hard drives between them, were also seized. Although the hard drives were searched, they did not yield information enabling Vandehey to identify the victim mentioned in Nader's report. Nevertheless, at some point in her 2003 investigation, Vandehey spoke with C. At that point, C did not want to have anything to do with the investigation, and Vandehey was not able to confirm at that time that C was, in fact, the person mentioned in Nader's report.

In the meantime, defendant was charged with 10 counts of encouraging child sex abuse in the second degree, ORS 163.686. Those charges were based on the pornographic materials found and seized during the search of his apartment. *See State v. Forker*, 214 Or App 622, 626, 168 P3d 279 (2007), *rev den*, 344 Or 280 (2008) (describing case). Ultimately, defendant pleaded guilty to all 10 counts, each of which merged into a single count of conviction for encouraging child sex abuse in the second degree. The trial court sentenced him to a term of probation.

As part of his plea agreement, defendant stipulated to "relinquish[ing] ownership of property, to-wit: all items seized from the defendant." The court ordered "that said property be released for destruction by the Washington County Sheriff's Office." The order directed the Sheriff's Office to retain the property until it was no longer needed as evidence, then destroy it "within six (6) months of the District Attorney's Office confirmation that all criminal cases are resolved," and finally "provide the Court with a written return indicating the manner in which the property was destroyed, the date, and by whom it was destroyed."

Shortly after the court entered judgment in that case, defendant filed a motion for the return of one computer—a Dell CPU tower—and its hard drives to him; defendant also requested the return of several other items. The court held a hearing on the motion; at the start of the hearing, defense counsel told the court he needed to do some more work on

the motion. He then explained what property defendant was seeking. With respect to the computer, the court observed that the state was "going to have trouble with the computer because it has pornography on it, and they can't distribute pornography." After the prosecutor reminded the court that defendant had agreed as part of his plea agreement to surrender his ownership interests in the seized items, which defense counsel confirmed, the court observed that that meant defendant needed to negotiate with the state about the return of any property. The court entered a written order ruling that the "motion to return seized property is to resolve by parties."

Following that hearing, defendant prepared a list of the items he wanted returned, and the state agreed to return some of the items. The Dell CPU tower and the hard drives were not among the items that the state agreed to return.

Defendant thereafter filed a new motion requesting return of the CPU tower "with any hard drives intact—after wiping by [the Washington County Sheriff's Office] if necessary." The court held a hearing on the motion in March 2010. At the hearing, defense counsel acknowledged that there had been images on the computer, and that the images could not be returned to defendant, but argued that defendant nonetheless should be entitled to the return of the computer and the hard drives. Defense counsel argued that the image issue could be resolved by wiping the hard drives; defense counsel acknowledged, though, that defendant would be satisfied with the return of the CPU tower without the hard drives.

The state opposed defendant's request to return the computer and hard drives. The prosecutor explained that wiping the hard drives might not be sufficient to eliminate any images because, according to the state's evidence technician, ghost images could be retrieved after wiping. The prosecutor noted the existence of companies that offer the service of retrieving files from wiped hard drives.

The court denied the motion. It explained that, because defendant had had images on his computer, it would not order the return of the computer. The court stated

further that it was not going to order the state to wipe the hard drives for the purpose of returning them to defendant. The court stated instead that those items were forfeited and to be destroyed. It entered an order stating "motion to return computer tower to defendant is denied. Computer forfeited & will be destroyed."

Defendant moved to Idaho after he was sentenced and while he was still on probation, which ran until 2014. In 2012, 2014, and 2017, Idaho authorities alerted Oregon authorities of reported incidents of defendant's sexual misconduct involving juvenile males. During the same period, in accordance with the judgment's specification that destruction of the evidence occur "when said property is no longer needed as evidence" upon "the District Attorney's Office confirmation that all criminal cases are resolved," the sheriff's office periodically contacted the district attorney's office to ask if the evidence could be destroyed. Each time, the district attorney's office directed that the evidence not be destroyed. In September 2016, the district attorney's office directed the sheriff's office to "[h]old evidence for 2 more yrs. Def[endant] is likely to reoffend."

The following July, C called Vandehey. In the phone call, C disclosed that defendant had sexually abused him when he was a teenager. Vandehey reopened her 2003 investigation and requested that the evidence not be destroyed.[1]

Vandehey then obtained a warrant to reexamine the hard drives seized in 2003 for evidence relating to crimes involving C. That search revealed evidence that arguably corroborated C's allegations of those crimes. Based on that evidence and C's disclosures, the state charged defendant with nine sex offenses for conduct occurring "between February 18, 2002 and December 31, 2002."

Defendant moved to suppress the evidence obtained from the warranted search of the hard drives. In his written

---

[1] When Vandehey requested that the property not be destroyed, she was under the impression that the district attorney's office had authorized the destruction. At the hearing on the motion to suppress, the prosecutor represented that although the district attorney had said he thought he recalled sending an order for destruction, there was no record of the sheriff's office ever receiving such an order.

motion, defendant argued that the destruction order was part of defendant's bargained-for deal with the state: "an agreement (stipulation) was made that Defendant would relinquish his ownership of the property, and that the State, *in consideration* of the relinquishment, would destroy said property when the criminal case was resolved." (Emphasis in original.) Defendant further asserted that, because he "agreed to give up possession in exchange for the destruction of the property," the state's failure to destroy the hard drives meant that it did not lawfully possess them at the time it searched them under the warrant.

Responding to defendant's motion, the state disputed defendant's assertion that destruction of the evidence had been part of the parties' bargained-for exchange. The state pointed out that the plea petition represented that petitioner understood that no promises had been made to him in connection with his plea. The state argued further that because he had given up his interest in the computers as part of his plea agreement, he retained no possessory or privacy interest in the computers at the time of the search, such that defendant's constitutional rights were not violated.

Additionally, the state contended that it was in lawful possession of the computers under the terms of the sentencing judgment, which provided for the destruction of the computers "within six (6) months of the District Attorney's Office confirmation that all criminal cases are resolved." The state noted that "activity occurred on the file until September 2014," and that "[t]he timeline for appeal of those legal issues had not expired, which is only part of the analysis regarding disposition of property and evidence." The state represented that law enforcement in Idaho had been contacting the sheriff's office regarding investigations into defendant that indicated that defendant was likely to reoffend, something that "made it impossible for the State to know whether or when 'all criminal cases' had been resolved." In support of that contention, the state submitted evidence of multiple communications from Idaho law enforcement regarding defendant's suspected crimes against juvenile males in Idaho.

Finally, the state asserted that even if it was in violation of the court's order regarding the destruction of

the hard drive, that would not be grounds for suppression because the "violation of a Court Order does not implicate a personal, constitutional right of the Defendant," such that the exclusionary rule would apply.

At the suppression hearing, defense counsel retreated from the assertion that defendant had bargained for the destruction of the property, acknowledging that "no one expressly promised Defendant anything regarding his property in order to adduce him to plead guilty." Defendant nevertheless continued to assert that the failure to destroy the hard drives meant that law enforcement possessed the hard drives illegally, and that the illegality was not cured by the issuance of the warrant: "The State was not legally in possession of the items, and the search warrant that was approved by the Court in 2017 did not cure that illegality[.]"

The state, in response, argued that, given the evidence of ongoing criminal activity by defendant, it legally possessed the computers and hard drives in a manner that comported with the judgment in defendant's criminal case. The state noted defendant's multiple probation violations and also pointed out that defendant was "being investigated for a second time as it relates to possible child molestation in [Idaho]." The evidence on defendant's computer, the state argued, was "evidence of the defendant's sexual predisposition towards children," which was "something that could be admissible" in those cases. The state argued further that, even if the court found that the retention of the evidence violated the court's order of destruction, that would not be a basis for suppression of evidence because the exclusionary rule operates as a remedy for constitutional violations only and is not a mechanism for redressing other violations of other laws or court orders. The state asserted that if "theoretically" the state were in violation of a court order, that would have been at most contempt of court, not a constitutional violation.

The trial court denied the motion. In oral statements on the record, the court determined that defendant had relinquished his interests in the property at issue, that the state lawfully possessed it at the time of the search, and that the search was supported by a warrant. Under those

circumstances, the court concluded, defendant had not met his burden to demonstrate a constitutional violation. The court also found that there was no evidence that the state had willfully violated the destruction order: "While there is some suggestion of some procrastination from the DA's Office there is no evidence before me that the DA's Office willfully violated a Court Order from Judge Hernandez." The court pointed out that "the case has a lengthy litigious history," and that the original judgment provided for destruction "when the property is no longer needed and that all criminal cases are resolved."

Thereafter, the court entered a written order memorializing its decision. The order stated, in relevant part:

"The Court having heard the testimony of Detective Dawn Vandehey, and having heard statements of counsel FINDS:

"1. At the time the computers were examined, Defendant had no possessory or privacy interests in the computers, so no search was conducted.

"2. Even if Defendant had a possessory or privacy interest in the computers, a valid search warrant was obtained prior to examination.

"3. Because Defendant's Constitutional rights were not violated, he is not entitled to suppression of any evidence derived from the search of the computers.

"4. The State was in lawful possession of the computers at the time of the examination of the hard drives.

"5. Even if the State was not in lawful possession of the computers at the time of examination, Defendant's Constitutional rights were not violated, so he is not entitled to suppression of the evidence."

The case was tried to a jury. The jury found defendant guilty as charged on each of the nine counts. The trial court sentenced defendant to a total of 411 months' incarceration. Defendant appealed.

## II.  ANALYSIS

In his first assignment of error, defendant challenges the trial court's denial of his motion to suppress. In

his second through sixth assignments of error, defendant challenges the trial court's decision to admit a range of items seized from his apartment in 2003, contending that the trial court abused its discretion under OEC 403 in determining that the items' probative value was not substantially outweighed by the danger of unfair prejudice. Finally, in his seventh assignment of error, defendant asserts that the trial court erred under OEC 401 when it excluded as irrelevant printouts of Facebook postings that defendant sought to offer as impeachment evidence. For the reasons that follow, we reject each of defendant's assignments of error.

A.   *Motion to Suppress*

We review a denial of a motion to suppress for legal error, accepting the trial court's supported explicit and implicit factual findings. *State v. Quigley*, 270 Or App 319, 320, 348 P3d 250 (2015).

On appeal, defendant's argument is predicated on related factual propositions: (1) that the destruction order contained in the judgment of his first cases was a bargained-for part of his plea deal; and (2) the state's failure to destroy the evidence seized from his apartment at some point prior to 2017 violated that destruction order. Defendant asserts that "defendant agreed to give up his possessory interest in his hard drives in exchange for the government's agreement to destroy those drives at the conclusion of his case." He asserts further that "[a]fter the parties executed the plea agreement, the trial court included that protection of defendant's interests in his judgment." Finally, he argues that "[b]y 2017, the state was plainly violating its agreement and both court orders by continuing to possess defendant's computer[s] and hard drives," making the state's continued possession an "illegality." Based on those asserted factual predicates—that the destruction of the computers was part of a bargained-for exchange intended to safeguard defendant's privacy interest in the content of the hard drives, that the trial court's destruction order was for the purpose of protecting defendant's interests, and that the trial court's order required destruction at some point before 2017—defendant asserts that the state's failure to destroy the hard drives

before they were searched again in 2017 infringed on defendant's constitutionally protected privacy interests. That violation, argues defendant, was not cured by the subsequently obtained warrant.

The state responds that defendant's argument fails because its main factual predicate fails:

> "The fatal flaw in [defendant's argument] is that it depends entirely on the notion that defendant, in pleading guilty to the charges in 2009, negotiated as part of a plea agreement the relinquishment of only his *possessory* interests in the 2003 property, contingent on the state destroying the property *in order to protect his privacy interests therein*. The record created around the 2009 judgment of conviction and the court records created after that do not support defendant's narrative."

(Emphases in original.) The state urges us to reject defendant's argument for that reason.

Having reviewed the record, we agree with the state. Defendant does not dispute that the evidence at issue here was obtained pursuant to a valid warrant. That means that defendant bore the burden of showing that the search was tainted by an earlier constitutional violation. *State v. Johnson*, 335 Or 511, 520-21, 73 P3d 282 (2003). Here, defendant's theory that an earlier constitutional violation occurred rests entirely on the factual proposition that he negotiated for the destruction of his property to protect his privacy interests in it, such that the state's failure to destroy the property violated his privacy interests. *See, e.g.*, *United States v. James*, 353 F3d 606, 616 (8th Cir 2003) (the defendant's directive that his property be destroyed "was in essence the ultimate manifestation of privacy, not abandonment"); *United States v. Basinski*, 226 F3d 829, 838 (7th Cir 2000) (concluding that the defendant's direction to another person to destroy the defendant's briefcase "manifested a desire that nobody possess or examine the contents of the briefcase," and did not constitute an abandonment of the defendant's privacy interest); *United States v. Fife*, 356 F Supp 3d 790, 801-02 (ND Iowa 2018) (defendant's desire that property be destroyed evidenced intent to maintain privacy interest).

Defendant's legal theory has some force in the abstract; had defendant, in fact, bargained for the destruction of the property seized from him, it might be inferable that the state's failure to carry out its end of such a bargain infringed upon a privacy interest of defendant. But, on this record, defendant's theory does not provide a basis to conclude that defendant's privacy interests have been infringed. That is because, as the state correctly points out, the record does not support defendant's factual assertion that the trial court's destruction orders were part of the plea bargain. Instead, as noted, at the hearing on the motion to suppress, defense counsel conceded that "no one expressly promised Defendant anything regarding his property in order to adduce him to plead guilty." That concession appears consistent with the written and signed plea petition, which stated:

"I [defendant] declare that no officer or agent of any branch of government (federal, state, or local) has made any promises or suggestions of any kind to me, or within my knowledge to anyone else, that I will receive a lighter sentence, or probation, or any other form of leniency if I plead GUILTY."[2]

In any event, that concession defeats defendant's factual assertion on appeal that he bargained for the destruction orders to protect his privacy interest.

Beyond that, to the extent defendant appears to suggest that the court's destruction and forfeiture orders were intended to protect *defendant's* interests, the records of the hearings on defendant's motion for return of property do not allow for the inference that those orders had anything to do with protecting defendant. On the contrary, the record indicates the point of the orders was to protect against the dissemination of the images on defendant's computer. The reason the trial court refused to return the computers and hard drives to defendant was because defendant had relinquished his interests in them, and because defendant had images on them.

---

[2] We recognize that this sentence is unclear as to whether defendant is acknowledging that no promises of "any kind" were made in exchange for the plea, or, instead, that no promises about "a lighter sentence, or probation, or any other form of leniency" were made in exchange for the plea. Defense counsel's concession, however, makes clear that, whatever the meaning, defendant's plea was not induced by a promise to destroy his property.

The dissenting opinion concludes otherwise. The dissenting opinion first asserts that "[t]he majority frames this case as turning on preservation; it does not." 323 Or App at 342 (James, P. J., dissenting). But preservation is not the basis for our decision; we have addressed the legal issue raised and ruled on below. Had defendant advanced the argument that the dissenting opinion has formulated then, perhaps, this case would turn on preservation; the argument presented by the dissenting opinion is not one that was litigated in the trial court, and we might reasonably have rejected it as unpreserved, if it had been made. But our conclusion that the approach advocated by the dissenting opinion is not one that has been litigated in this case does not mean that we have resolved this case on preservation grounds. In other words, we have not framed the *case* in terms of preservation; we have explained simply that we cannot join the dissenting opinion's approach because it does not bear much resemblance to the case presented by the parties.

The dissenting opinion then starts from the proposition that "[t]his is a case in search of a protected constitutional interest." *Id*. The dissenting opinion next articulates a constitutional theory detached from the facts of this case. It announces the "foundational principles" that should govern a person's interests in data when that data is seized by law enforcement. *Id*. at 343. It then reasons that, under those foundational principles, defendant retained a protected interest in some of the data contained on his hard drives and computers, notwithstanding his agreement to his relinquishment interests in his data, such that the failure to destroy the evidence by the time the victim finally came forward violated defendant's constitutional rights.[3]

That approach is problematic for at least three reasons.

---

[3] In the course of that analysis, the dissenting opinion characterizes our opinion as "find[ing] that defendant had no protected constitutional interest in [the] data" contained on the devices seized from defendant. 323 Or App at 342 (James, P. J., dissenting). That is not accurate. What we have done is resolved the issue on appeal by tethering ourselves to the facts as determined by the trial court, which include the facts that defendant relinquished his interests in the seized property, and that the destruction order was not part of defendant's bargained-for exchange with the state.

The first, as noted, is that it bears almost no resemblance to the arguments presented by the parties or resolved by the trial court. The dissenting opinion's analysis centers on the concept of defendant retaining protected rights in "nonresponsive data" but the notion of "nonresponsive data" has not played a role in the parties' arguments at any point in this case and did not play a role in the trial court's decision. The dissenting opinion notes that "[t]he state argues that there is no evidence that defendant negotiated for destruction of his property or that the state agreed to destroy the property for the purpose of protecting his privacy." 323 Or App at 356 (James, P. J., dissenting). The dissenting opinion then asserts that the state's argument "misses the point." But the state's argument meets defendant's argument precisely, responding directly to the premise of defendant's argument. That is what an advocate is expected to do: respond to the arguments made by the opposing advocate.

A second problem with the dissenting opinion's approach is that it purports to dictate a constitutional approach to searches and seizure of data. This is an important and developing area of law, and the right path through it is not yet clear cut or well illuminated. To the extent our court must steward the law through the decisions we are charged with making, it is critical for us to hear from different voices—including those of the parties—on the different approaches we might take, and the strengths and weaknesses of those approaches. The approach voiced by the dissenting opinion may ultimately prove to be sound, but, as yet, it has not been tested by the adversarial process. The only voices we have heard are our own.

A third problem with the dissenting opinion's approach is that it is predicated on the assumption that the state's failure to destroy the evidence violated the order to destroy the computer contained in the judgment entered following defendant's plea agreement. The court below, however, made no finding that there was in fact a violation of the order. Apparently focusing on the possibility that the state was in contempt, the court determined that "there is no evidence before me that the DA's Office willfully violated a Court Order from Judge Hernandez."

That determination is not surprising, as it is not clear that the state was in violation of the order. By its terms, the order stated:

> "[W]hen said property is no longer needed as evidence, the law enforcement agency shall destroy said property within six (6) months of the District Attorney's Office confirmation that all criminal cases are resolved and shall provide the Court with a written return indicating the manner in which the property was destroyed, the date, and by whom it was destroyed."

Thus, the state was authorized to hold onto the evidence until "said property is no longer needed as evidence" and "all criminal cases are resolved." As the state noted below, the ongoing investigations into defendant's criminal conduct, including suspected child sexual abuse, gave little reason to think that "all" criminal cases had been resolved, or that the property no longer had evidentiary value. That is true even if the order was intended to refer only to the resolution of criminal cases related to crimes arising before the date of the court's order, and not to future crimes.

In that regard, it's worth noting that the computer and hard drives originally were seized as part of an investigation into defendant's sexual abuse of the victim in this case, who was a minor at the time. At the time of defendant's plea, the statute of limitations applicable to the offenses against the victim in this case allowed for prosecution "anytime before the victim attains 30 years of age or within 12 years after the offense is reported to a law enforcement agency or the Department of Human Services, whichever occurs first." ORS 131.125(2) (2007), *amended by* Or Laws 2009, ch 585, § 1; Or Laws 2011, ch 666, § 2; Or Laws 2011, ch 681, § 3; Or Laws 2012, ch 70, § 2; Or Laws 2015, ch 417, § 1; Or Laws 2016, ch 47, § 5; Or Laws 2016, ch 120, § 1. Under those circumstances, the wording of the court's order plausibly could be understood to authorize the retention of the evidence until the limitations period was likely to have run on the crimes against the teenage victim who had not yet been identified. It is difficult to think that a court would order the affirmative destruction of evidence of child sexual abuse before the likely expiration of the limitations period, and the expansive wording of the order—providing

for retention of the property until "all criminal cases are resolved," reasonably could be read to require the retention of the evidence for the limitations period. In any event, as defendant acknowledged at the hearing on the motion to suppress, "the language by the court in the original judgment [] is not 100 percent concrete when all criminal cases are resolved," and, for that reason, allows for the possibility that the state was not in violation of the order at all.

Although not raised by defendant on appeal, we acknowledge that the prosecutor's directive to retain the evidence because defendant was "likely to reoffend" raises concerns that we are unable to ignore. That directive, on its face, would support the inference that the state thought it could retain the evidence even after all criminal cases were resolved and no current investigations were pending, a position at odds with the terms of the order—a practice that, besides being contemptuous, would give rise to significant privacy concerns. But viewed within the concrete factual context in which the directive was issued, that is not the only reasonable interpretation of the prosecutor's directive. Rather, it could have referred to investigations that were ongoing, as discussed above. And the trial court must have rejected any concerning interpretation of that directive because it explicitly found on the record "there is no evidence before me that the DA's Office willfully violated a Court Order from Judge Hernandez." That determination that there was no evidence of a willful violation of the court order has not been challenged on appeal.

In sum, for the reasons stated above, defendant's first assignment of error does not provide a basis for reversal and the dissenting opinion's constitutional theory does not provide a basis for concluding otherwise.

## B.  *Admission of Evidence from Defendant's Apartment*

Defendant next assigns error to the trial court's overruling of his objection under OEC 403 to the admission of two VHS tapes, a DVD, two books, an article, and a poster, that were seized from his apartment in 2003. The items addressed or depicted sex with children and teenagers. Our review of the court's OEC 403 ruling is for abuse of

discretion. *Scott v. Kesselring*, 370 Or 1, 26, 513 P3d 581 (2022).

The state argued that its need for the evidence was great because the victim's delayed disclosure meant that it had little corroborating evidence for what, ultimately, would be a case that would turn on credibility. The challenged evidence, in the state's view, would corroborate the victim's version of events by demonstrating that defendant had a sexual interest in boys at the time of the charged offenses. After hearing the defense's argument on why the evidence would be unfairly prejudicial, the court determined that it would admit most, but not all, of the evidence, declining to omit a binder of photographs that the court deemed too graphic. The court explained that it had "done a balancing test," and that it was persuaded by the state's description of the need for the evidence given "[t]he fact that this case is so old." It explained further that evidence it would allow in was "more general in nature" than the evidence it was excluding, which was more graphic. Although the court would have been within its discretion to reach a different conclusion, the one that it did reach was within the range of permissible options available to it in the exercise of the "broad discretion" conferred on trial courts under OEC 403. *See State v. Shaw*, 338 Or 586, 615, 113 P3d 898 (2005) (noting that trial courts have "broad discretion" under OEC 403).

C.  *Exclusion of Facebook Printouts*

In his final assignment of error, defendant asserts that the trial court erred when it ruled that he could not introduce into evidence two printouts from C's Facebook page. Defendant sought to introduce the printouts on cross-examination of the victim for the purpose of impeaching the victim's testimony that, around the time he reported defendant's abuse in 2017, that he couldn't "really handle being touched," and was experiencing other symptoms of anxiety. The printouts showed the victim with other people at a club, something that called into question the victim's testimony about his emotional state. The trial court excluded the printouts as irrelevant. On appeal, defendant reiterates his argument that the printouts were relevant to impeach the victim's testimony about his emotional state.

Defendant's arguments do not provide a basis for reversal. Even if the evidence would be relevant to impeach the victim's testimony about his emotional state in 2017, as the state points out, extrinsic evidence is not admissible to impeach a witness regarding a "collateral matter." *State v. Gibson*, 338 Or 560, 573, 113 P3d 423 (2005). A matter is collateral if it is not something that the cross-examining party would be entitled to prove as part of its case. *Id*. In this case, the victim's emotional state in 2017 was collateral both to the state's case in chief and to defendant's defense, which was that the alleged conduct had not occurred. Accordingly, the printouts would not have been admissible.

In addition, even if they were admissible, on this record any error in excluding them was harmless. The impeachment value of the printouts was minimal; that the victim might have enjoyed himself at a club on occasion does not tend to undermine his testimony about his general emotional state. A jury would be well aware that humans are capable of experiencing a range of emotions. Moreover, as noted, the victim's emotional state in 2017 was not relevant to the charges or the defense, and the excluded materials showing the victim at a club in 2017 had no bearing on whether defendant had committed the charged conduct in 2002. As a result, the exclusion of the printouts had no likelihood of affecting the jury's verdict and was, therefore, harmless. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (stating standard for assessing whether evidentiary error is harmless).

Affirmed.

**JAMES, P. J.,** dissenting.

The state seized defendant's property—nonresponsive data that had no nexus to any crime of investigation—then held it for over a decade, in my view in defiance of court order for its destruction, because the state believed that defendant was "likely to reoffend." And today, we do nothing about that. Our decision today leaves me greatly concerned—concerned for the constitutional and property rights of Oregonians and concerned that we have potentially incentivized prosecutors to disregard trial court orders.

## I.  PRESERVATION

The majority frames this case as turning on preservation; it does not. Concluding that my analysis of the constitutional significance of the state's actions in this case is somehow beyond the scope of the issues raised below or on appeal, the majority disregards it. But, as the majority itself relates, the issue of control of data has always been a subject of litigation in this case—spawning multiple motions for return of property, two court orders that the computer be destroyed, a motion to suppress, and this appeal. The parties have argued throughout this case about whether the state violated defendant's rights under Article I, section 9, of the Oregon Constitution by failing to destroy his property after he surrendered ownership as part of the plea process. No, the gulf between the majority and myself is not born of preservation, but conceptualization.

This is a case in search of a protected constitutional interest. While the government violated a court order, suppression may not be available unless defendant retained a constitutionally recognized right in the data that the government continued to seize, in violation of that court order. The majority finds that defendant had no protected constitutional interest in that data, reasoning that

> "the record does not support defendant's factual assertion that the trial court's destruction orders were part of the plea bargain *** [and] the records of the hearings on defendant's motion for return of property do not allow for the inference that the trial court's destruction orders were intended to protect defendant's interests."

323 Or App at 335.

To me, that begs a question: If the court's order to destroy defendant's property was not pursuant to defendant's agreement and consent via plea, under what authority was it done?

As I will explain, answering that question drives this case, and for me, compels a different understanding of the proceedings. And my approach to answering it—contextualizing the plea process, understanding why the plea process and defendant's consent are the sole source of

authority for the court's order to destroy his property that was not itself connected to his crimes, and understanding why the subsequent forfeiture orders cannot be understood to somehow independently extinguish his right to delete the data on the hard drives—is an approach fairly encompassed within the constitutional question that was fully litigated below and on appeal. *See, e.g.*, *State v. Weaver*, 367 Or 1, 18-19, 472 P3d 717 (2020) (constitutional question was properly before the court where, on appeal, "both parties have refined their arguments" but had not "moved far from the central concerns developed in the trial court"); *State v. Reed*, 241 Or App 47, 52 n 2, 249 P3d 557, *rev den*, 350 Or 574 (2011) (explaining the decision to "reframe the issue presented [by the appellant] to conform with the trial court's actual ruling"). Where parties have properly raised a constitutional challenge like this, we should not shy away from identifying the relevant considerations for properly analyzing that question and developing constitutional jurisprudence. *See, e.g.*, *State v. Gray*, 370 Or 116, 123, 515 P3d 348 (2022) ("Although neither party argues that that statute directly or fully answers the constitutional right-to-counsel question, it is relevant context for our consideration of that question.").

## II.   PRINCIPLES OF DATA

To explain my approach, I begin with a few foundational principles that underly my analysis.

### A.   *Data is valuable property.*

This point may be obvious, but it needs acknowledgment: Data has value apart from the physical container that contains it. The value of data comes in many forms. Data can have sentimental value. As an example, on my phone is a voicemail from my late father. I have saved it for years—the only recording I have of him. My physical phone has little value in my life beyond money; that data file however—the sound of my father's voice—is immeasurable. Data can be valued intellectual property, for example, hundreds of pages of a novel years in the making. Data can be trade secrets at the core of a business's value—formulas, recipes, algorithms. And, of course, data can be currency. Cryptocurrency tokens

or private keys are data files that are essential to accessing the currency. For cryptocurrency—the data file is the money.

When we talk about the seizure of data, we're talking about the seizure of valuable property. The value of that data, and the impact of the seizure, is not gauged by the impact of the seizure of the physical receptacle. The owner of a trade secret formula may care less whether the physical computer is seized, so long as she has access, and others do not, to the formula—the data on the computer. In short, the seizure of data—interfering with access to data—is no less significant than the seizure of a car, a bank account, a safe, or a home.

B.   *The seizure of responsive data nearly always involves the seizure of nonresponsive data.*

In a criminal investigation, the government may develop probable cause that data may exist that has evidentiary value to the crime of investigation—for example, images, in the investigation of child pornography, financial records, in the investigation of tax fraud, or text communications, in the investigation of conspiracy, etc. When the government is granted a warrant to seize, and search for, data of an evidentiary value, it is seizing, and searching for, *responsive* data.

The execution of a warrant for the seizure and search of responsive data almost always involves the seizure of physical objects—a computer, a hard drive, a cell phone. The physical object itself rarely has any evidentiary value on its own—its value comes only in that it is the physical repository of the responsive data. To achieve the goal of seizing the responsive data, the government must seize the physical object—a predicate step in conducting the search. Orin S. Kerr, *Fourth Amendment Seizures of Computer Data*, 119 Yale L J 700, 702 (2010). ("Computer search and seizure inverts the usual pattern of criminal investigations. When searching for traditional physical evidence, the police first search for property and then seize it. Computer technologies often require investigators to obtain a copy first and then search it later. Nearly every case begins with copying data

that will later be searched, and government investigators often will prefer to copy more rather than less if the Fourth Amendment allows it.").

The nature of electronic data, however, is that it exists in copious amounts. As the Oregon Supreme Court has recognized, "unlike most other 'things' that may be seized in a search, a computer or other digital device is a repository with a historically unprecedented capacity to collect and store a diverse and vast array of personal information." *State v. Mansor*, 363 Or 185, 208, 421 P3d 323 (2018). Even basic physical receptacles can hold vast troves of data. An ordinary smartphone, with only 64 gigabytes of storage can hold approximately 40,960 images, 15,360 MP3 files, over 1.2 million pages of Word documents, or 20,480 minutes of video. Computer hard drives, the subject of this case, can hold far, far more. The result is that when a physical receptacle is seized, to permit a search for *responsive* data, the government has necessarily seized vast quantities of *nonresponsive* data as well. For every illicit photograph there may be hundreds of innocuous emails. For every financial record of fraud, there may be private medical records. For every text between conspirators, there are likely many more amongst social acquaintances. This nonresponsive data has no evidentiary value—it is not evidence, instruments, or proceeds of a crime. It has no relationship, via probable cause, to the crime of investigation. But, as discussed above, it has value.

C.   *For digital property, the rights of privacy and possession are effectuated by the corollary right to control exclusive access, which includes the right to destroy.*

The third foundational principle about digital data that must be understood is that the traditional dichotomy of privacy and possession does not fully encapsulate the relationship people have with data, and their attendant constitutional rights. Article I, section 9, of the Oregon Constitution provides that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place

to be searched, and the person or thing to be seized." In *State v. Campbell*, 306 Or 157, 166-67, 759 P2d 1040 (1988), the court explained that those "constitutional provisions against unreasonable searches and seizures do not protect a right to keep any information, no matter how hidden or 'private,' secret from the government." Rather, "[w]hat the provisions forbid are unreasonable searches and seizures, *i.e.*, certain *acts* of the government." *Id.* (emphasis in original). Generally speaking, with respect to property, those "acts" under Article I, section 9, have broken down along the lines of invasions of possessory or ownership interests (seizures) and invasions of privacy interests (searches). *See State v. Owens*, 302 Or 196, 207, 729 P2d 524 (1986).

Seizure is typically denoted as an interference with possessory interest—a term that is entirely court created, as it does not appear in either the state or federal constitutions.

> "The term 'possessory interest' does not appear in the text of Article I, section 9; rather, it is a term that this court and other courts (usually interpreting the Fourth Amendment) have used to determine whether an item of property has been seized for constitutional purposes. The concept of a possessory interest, as it is pertinent to Article I, section 9, is grounded in property law."

*State v. Barnthouse*, 360 Or 403, 414-15, 380 P3d 952 (2016) (citation omitted).

*Barnthouse* involved the application of "possession" in the context of mail in transit. The court recognized that one clearly has lost possession of a parcel once it is placed in the mail. Nevertheless, the court noted "the issue here is not whether defendant *possessed* the package; rather it is whether defendant had a protected *possessory interest* in it." *Id.* at 416 (emphases in original). Any discussion of data must recognize that, like the mail in *Barnthouse*, data involves possessory interests that transcend actual or constructive possession.

There is a well-known adage that "information wants to be free." Data is a caged bird; the door need only be opened once for it to fly into the world. Accordingly, the possession of data is denoted not so much by positivity as negativity; possessing data is not simply a function of having it,

it is controlling *who does not have it*. Controlling exclusivity of access is what it means to possess data.

We recently explained in *Reed v. Toyota Motor Credit Corp.*, 301 Or App 825, 832, 459 P3d 253 (2020), that "[p]roperty is more than just the physical thing" but "the sum of all the rights and powers incident to ownership of the physical thing. It is the tangible and the intangible. Property is composed of constituent elements and of these elements *the right to use the physical thing to the exclusion of others is the most essential and beneficial*." (Emphasis in original.) Although less frequently asserted, the right to destroy property is among those rights.

> "The right to destroy property is, after all, often an extreme exercise of some of the more widely recognized sticks in the bundle of rights. The right to destroy is an extreme version of the right to exclude; by destroying a vase, I permanently exclude third parties from using it. The right to destroy is also an extreme version of the right to use; by destroying a piece of jewelry, I do not merely use it—I use it up. Finally, we might understand the right to destroy as an extreme right to control subsequent alienation. By destroying property, the owner can prevent it from *ever* being resold or used in a manner that displeases her without running afoul of the Rule Against Perpetuities. Indeed, the justifications traditionally given for inalienability rules are both similar to and different from the justifications given for restricting the destruction of one's property."

Lior Jacob Strahilevitz, *The Right to Destroy*, 114 Yale L J 781, 794-95 (2005) (emphasis in original) (describing that long-recognized property right); *see also Almeida v. Holder*, 588 F3d 778, 788 (2d Cir 2009) (property rights "include not only the right to actual possession of a thing, but also the right to exclude others from possessing it, the right to use it and receive income from its use, the right to transmit it to another, and the right to sell, alienate, waste, or even destroy it" (citing Hon James L. Oakes, *"Property Rights" in Constitutional Analysis Today*, 56 Wash L Rev 583, 589 (1981)).

In the context of data, which is so easily replicated and disseminated, the right to delete it, thereby excluding

others from using it, has greater importance than with other types of property. *See* Paul Ohm, *The Fourth Amendment Right to Delete*, 119 Harv L Rev F 10, 14 (2005) (discussing the import of the right to delete data). The legislature has recognized as much in amendments to ORS chapter 133 that post-date defendant's plea agreement but that reflect longstanding concerns about privacy interests in electronic data. *See also* Kerr, 119 Yale L J at 712 ("The law should focus on when the person loses exclusive rights to the data. The reason is that computer environments are data environments. In a world of data, whether an individual has access to a particular copy of her data has much less significance than whether the government has obtained a copy of the data for possible government use in the future.").

D.    *Property rights—including the right to destroy—are not lost simply because nonresponsive digital property has been seized in order to effectuate the seizure of responsive digital evidence.*

The process for the state's handling of seized property is governed by statutory as well as constitutional limits. The right to exclusivity of use, and the right to destroy, is recognized in Oregon statute. ORS 133.535 provides:

"The following are subject to search and seizure under ORS 133.525 to 133.703:

"(1)   Evidence of or information concerning the commission of a criminal offense;

"(2)   Contraband, the fruits of crime, or things otherwise criminally possessed;

"(3)   Property that has been used, or is possessed for the purpose of being used, to commit or conceal the commission of an offense; and

"(4)   A person for whose arrest there is probable cause or who is unlawfully held in concealment."

ORS 133.633 sets out a procedure for a motion for return or restoration of seized things, allowing "[a]n individual from whose person, property or premises things have been seized" to "move the appropriate court to return things seized to the person or premises from which they were seized." ORS 133.633(1)(a). ORS 133.643 contemplates that

the seizure of property, apart from contraband or fruits of the crime, is only a temporary interference with property rights:

"A motion for the return or restoration of things seized shall be based on the ground that the movant has a valid claim to rightful possession thereof, because:

"(1)  The things had been stolen or otherwise converted, and the movant is the owner or rightful possessor;

"(2)  The things seized were not in fact subject to seizure under ORS 131.550 to 131.600 or 133.525 to 133.703;

"(3)  The movant, by license or otherwise, is lawfully entitled to possess things otherwise subject to seizure under ORS 133.525 to 133.703;

"(4)  Although the things seized were subject to seizure under ORS 133.525 to 133.703, the movant is or will be entitled to their return or restoration upon the court's determination that they are no longer needed for evidentiary purposes; or

"(5)  The parties in the case have stipulated that the things seized may be returned to the movant."

If there is a dispute over a motion for return of seized items, it is resolved by the court under ORS 133.663, which provides:

"(1)  If, upon consideration of a motion for return or restoration of things seized, it appears to the court that the things should be returned or restored, but there is a substantial question whether they should be returned to the person from whose possession they were seized or to some other person, or a substantial question among several claimants to rightful possession, the court may:

"(a)  Return the things to the person from whose possession they were seized; or

"(b)(A)  Impound the things seized and set a further hearing, assuring that all persons with a possible possessory interest in the things in question receive due notice and an opportunity to be heard; and

"(B)  Upon completion of the hearing provided for in subparagraph (A) of this subsection, enter an order for the return or restoration of the things seized.

"(2)  If there is no substantial question whether the things should be returned to the person from whose possession they were seized, they must be returned to the person upon the release of the defendant from custody.

"(3)  Instead of conducting the hearing provided for in subsection (1)(b)(A) of this section and returning or restoring the property, the court in its discretion, may leave the several claimants to appropriate civil process for the determination of the claims."

A trial court "shall postpone execution of the order until such time as the things in question need no longer remain available for evidentiary use," and the court's order regarding the return of seized things is "reviewable on appeal upon certification by the court having custody of the things in question that they are no longer needed for evidentiary purposes." ORS 133.653(1), (2).

Critically, ORS 133.633(5)(a) specifically addresses the return of data obtained from forensic imaging of a computer: "The things seized that are the subject of a motion for return under this section may include raw data obtained from the forensic imaging of a portable electronic device or of a computer." A related statute, ORS 133.653, puts an express limitation on the ability of law enforcement agencies to keep and hold the raw data that has been obtained from computers and portable electronic devices: "An order granting a motion for return of raw data obtained from the forensic imaging of a portable electronic device or of a computer shall include a provision that a law enforcement agency may not retain a copy of the raw data to be returned." ORS 133.653(3)(a).

E.  *Continued governmental retention of nonresponsive data beyond when it could have reasonably been separated from responsive data is an unwarranted ongoing seizure, even when the responsive data has been initially seized pursuant to a warrant.*

When a warrant is executed to search for responsive data, nonresponsive data is not seized pursuant to that warrant. Nonresponsive data is seized as a reasonable, temporary, *unwarranted* seizure necessary to effectuate the warranted search. Conducting the search—sifting the

responsive from nonresponsive data, can take time. But that time is not without limits; it is bounded by the reasonableness requirement of Article I, section 9, of the Oregon Constitution. Accordingly, when we are considering the ongoing retention of nonresponsive data, we are always in a warrantless posture, meaning the burden is on the state to establish reasonableness.

The Second Circuit, in the context of the Fourth Amendment, addressed the continued retention of data in *United States v. Ganias*:

"Not surprisingly, the ability of computers to store massive volumes of information presents logistical problems in the execution of search warrants. It is 'comparatively' commonplace for files on a computer hard drive to be 'so intermingled that they cannot feasibly be sorted on site.' *** [F]orensic analysis of electronic data may take months to complete. It would be impractical for agents to occupy an individual's home or office, or seize an individual's computer, for such long periods of time. It is now also unnecessary. Today, advancements in technology enable the Government to create a mirror image of an individual's hard drive, which can be searched as if it were the actual hard drive but without interfering with the individual's use of his home, computer, or files.

"In light of the significant burdens on-site review would place on both the individual and the Government, the creation of mirror images for offsite review is constitutionally permissible in most instances, even if wholesale removal of tangible papers would not be. Indeed, the 2009 amendments to the Federal Rules of Criminal Procedure, which added Rule 41(e)(2)(B), clearly contemplated off-site review of computer hard drives in certain circumstances. Although Rule 41(e)(2)(B) was not in effect in 2003, when the warrant was executed with respect to Ganias's computers, case law both before and after the rule's adoption has recognized that off-site review of seized electronic files may be necessary and reasonable.

"The off-site review of these mirror images, however, is still subject to the rule of reasonableness. *See, e.g.*, [*United States v.*] *Ramirez*, 523 US [65, 71], 118 S Ct 992[, 140 L Ed 2d 191 (1998)] ('The general touchstone of reasonableness which governs Fourth Amendment analysis governs the

method of execution of the warrant.' (citation omitted)). The advisory committee's notes to the 2009 amendment of the Federal Rules of Criminal Procedure shed some light on what is 'reasonable' in this context. Specifically, the committee rejected 'a presumptive national or uniform time period within which any subsequent off-site copying or review of the media or electronically stored information would take place.' Fed R Crim P 41(e)(2)(B) advisory committee's notes to the 2009 Amendments. The committee noted that several variables—storage capacity of media, difficulties created by encryption or electronic booby traps, and computer-lab workload—influence the duration of a forensic analysis and counsel against a 'one size fits all' time period. *Id.* In combination, these factors might justify an off-site review lasting for a significant period of time. They do not, however, provide an 'independent basis' for retaining any electronic data 'other than [those] specified in the warrant.' *United States v. Comprehensive Drug Testing, Inc.*, 621 F3d 1162, 1171 (9th Cir 2010) (en banc)."

755 F3d 125, 135-36 (2d Cir 2014), *on reh'g en banc*, 824 F3d 199 (2d Cir), *cert den*, 137 S Ct 569, 196 L Ed 2d 445 (2016) (citations omitted).

      *Ganias* did not specify the boundaries of reasonableness for data retention but found no difficulty in concluding that the two years the government retained nonresponsive data in that case to be constitutionally unreasonable.

"If the 2003 warrant authorized the Government to retain all the data on Ganias's computers on the off-chance the information would become relevant to a subsequent criminal investigation, it would be the equivalent of a general warrant. The Government's retention of copies of Ganias's personal computer records for two-and-a-half years deprived him of exclusive control over those files for an unreasonable amount of time. This combination of circumstances enabled the Government to possess indefinitely personal records of Ganias that were beyond the scope of the warrant while it looked for other evidence to give it probable cause to search the files. This was a meaningful interference with Ganias's possessory rights in those files and constituted a seizure within the meaning of the Fourth Amendment. *See United States v. Place*, 462 US 696, 708, 103 S Ct 2637, 77 L Ed 2d 110 (1983) (detaining a traveler's luggage while awaiting the arrival of a drug-sniffing dog

constituted a seizure); *see also Soldal v. Cook Cnty.*, 506 US 56, 62-64, 68, 113 S Ct 538, 121 L Ed 2d 450 (1992) (explaining that a seizure occurs when one's property rights are violated, even if the property is never searched and the owner's privacy was never violated); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 US 419, 435, 102 S Ct 3164, 73 L Ed 2d 868 (1982) ('The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights.').""

*Id*. at 137.

The Oregon Supreme Court invoked many of these principles, in a related context, recently in *State v. Thompson*, 370 Or 273, 285, 518 P3d 923 (2022), involving the warrantless seizure of a phone, then a five-day delay in applying for a warrant. The court noted, implicitly, the distinction between responsive and nonresponsive data by reference to the phone itself:

"The state also argues that, once police have lawfully seized evidence of an alleged crime, they may then hold that evidence indefinitely for use at trial, without a warrant. The state relies on cases in which, the state argues, this court implied that containers of illicit substances, once lawfully searched, may be held for use at trial.

"The state's reliance on those cases is misplaced. In those cases, the evidence at issue was allegedly unlawful or controlled substances and their containers. *** [T]o the extent that those cases did permit the police to hold property without a warrant, they did so in part because the property at issue was contraband, and its possession by the defendants was illegal.

"In this case, however, the evidence at issue was defendant's own phone—not stolen property or contraband—and it was, of course, lawful for defendant to possess the phone. Although the defendants in [*State v.*] *Heckathorne*[, 347 Or 474, 223 P3d 1034 (2009)], [*State v.*] *Owens*[, 302 Or 196, 729 P2d 524 (1986)], and [*State v.*] *Herbert*[, 302 Or 237, 729 P2d 547 (1986),] would not have been able to have their seized contraband returned to their possession, *see* ORS 133.643(3) (requiring that someone seeking the return of seized things must be lawfully entitled to possess those things), here, police could have returned defendant's phone. *Heckathorne*, *Owens*, and *Herbert* are distinguishable from

this case and do not stand for the proposition that any property, once in police custody, may be retained indefinitely as evidence in the absence of a warrant."

*Id*. at 285-86 (citations omitted).

*Thompson* cautioned that "[e]ach search or seizure by the state, including continuing seizures, must be reasonable." *Id*. at 281. Further, the court noted that it has consistently held that "Article I, section 9, of the state constitution *** may be more restrictive of police activity than the federal constitution." *Id*. at 286. Finally, it admonished that

"our cases do not countenance an open-ended reasonableness inquiry that balances law enforcement's investigative needs against an individual's property interests. Rather, our cases make clear that police may justify temporary warrantless seizures only to the extent that those seizures are 'reasonably necessary to effectuate' an investigation, and police activities that 'exceed those limits [require] an independent constitutional justification.'"

*Id*. at 286-87 (brackets in original).

## III.   APPLICATION

With those foundational principles set out, I turn now to the crux of the parties' dispute in this case, whether the state interfered with any cognizable constitutional interest in the data on the hard drives after defendant surrendered ownership as part of the plea process and subsequent orders. And I return to the question I began with: If the court's order to destroy defendant's property was not made pursuant to defendant's agreement and consent via plea, under what authority was it done? The answer, of course, is *none*. The data at issue here included all data on the drives—including nonresponsive data. For that nonresponsive data in the state's possession—digital property with no connection to criminal activity—the trial court had as much authority to order its destruction as it would have to order the destruction of defendant's house, or closure of his retirement account. The state could not *retain* that data beyond the bounds of constitutional reasonableness; it follows that it certainly could not *destroy* it. If the court here could summarily order destruction of digital property that

had no connection to a crime, Article I, section 9, reasonableness and Oregonians' property rights mean nothing.

As such, the only explanation for how the court could have lawfully ordered the destruction of defendant's property—his nonresponsive data—is that defendant conferred that authority upon the court as part of his plea, to effectuate his privacy rights. The court, through its order, was effectuating defendant's rights to destroy his digital property. Destruction of defendant's nonresponsive data was something that defendant implicitly bargained for—any other reading of the plea proceedings is untenable. Accordingly, when defendant points to the plea as evidence of his protected interest for purposes of suppression, he is correct.

When defendant's physical computer, and the data contained therein, was lawfully seized and searched in 2003, the government interfered with his possessory interest in the physical computer and the digital data stored on it. *See Owens*, 302 Or at 207 ("[O]nce the item has been lawfully seized, the person's possessory interest in that property has been substantially reduced."). But defendant did not at that point lose ownership of the hard drives themselves or the data on them; he had the ability to seek the return or restoration of the hard drives and any data that he could lawfully possess once it was no longer needed as evidence. ORS 133.633; ORS 133.663. Among other ownership rights, defendant would have retained the right to delete the data that he could lawfully possess, once it was no longer needed for evidence.

It was in that context that defendant gave up his ability to seek the return or restoration of the hard drives, and he did so in the context of an express obligation on the part of the state to destroy the hard drives once they were no longer needed for evidence. The judgment states, as part of a single sentence, that defendant relinquished his ownership "[p]ursuant to defendant's stipulation," and that "said property" was ordered to be "*released for destruction* by the Washington County Sheriff's Office." (Emphasis added.) Given that context, the only plausible understanding of the judgment is that defendant surrendered his right to return

of the data on the hard drives but not his interest in the destruction of the hard drives and their contents. The plea judgment did not extinguish defendant's constitutional interests; rather, it effectuated them.

The state argues that there is no evidence that defendant negotiated for destruction of his property or that the state agreed to destroy the property for the purpose of protecting his privacy. That misses the point. The inquiry is not what defendant did to enforce his rights, but whether the government had the lawful authority to extinguish them. Accordingly, the predicate question is, by what authority did the court order the destruction of defendant's property that was not itself connected to the crimes for which he was being prosecuted? The answer can only be the plea process: The plea judgment itself couples the surrender of ownership and the destruction of the property in a single sentence. Given the nature of the property at issue and the statutory context governing seized property, the judgment created reasonable expectations among the parties that the property was being surrendered under circumstances in which it would be destroyed when no longer needed for evidence, not subsequently retained by the state indefinitely or shared with others. *See Barnthouse*, 360 Or at 414-17 (possessory rights are grounded in property law and do not always depend on actual or constructive possession). *Cf. State v. Tanner*, 304 Or 312, 323, 745 P2d 757 (1987) ("In general, then, the entrustment of an effect to another is sufficient to establish a privacy interest that is violated when the effect is discovered through an unlawful search.").

I do not understand the trial court's subsequent order regarding "forfeiture" of the computer to have occurred in a vacuum, somehow independently extinguishing defendant's possessory right to delete the data on the hard drives. When defendant moved for the return of the hard drives themselves, he asserted his right to control what was done with the data. He requested the return of the computer tower "with any hard drives intact—*after wiping by WSCO if necessary*." (Emphasis added.) When the court denied that motion, it again did so in a way that effectuated, rather than extinguished, defendant's right to control his data, by

ordering that the computer, *and the data stored therein*, was "forfeited and shall be destroyed."

As such, I cannot join the majority in its conclusion that defendant's plea and the court's subsequent orders extinguished all of his constitutionally recognized rights for purposes of Article I, section 9. At the very least, defendant retained a right to control whether the data on his hard drives was deleted as contemplated under the plea judgment and later order.

The state significantly interfered with that possessory right when it retained the data in breach of the obligation to destroy it. The court observed in *Mansor* that "the novel nature of digital devices has led courts to apply search and seizure principles to those devices in a manner somewhat different from other physical evidence." 363 Or at 200. Regardless of how the state's failure to destroy other categories of evidence might affect possessory interests, its continued possession and subsequent search of defendant's hard drives and the nonresponsive data on them was a significant interference with defendant's right to control the exclusive access to that property. The state's failure to destroy something that it was obligated to destroy resulted in defendant's data being subject to a subsequent analysis that would not have occurred had the state complied with that obligation. The state's act of retaining data that should have been destroyed was a constitutionally significant invasion of defendant's constitutionally protected rights in the hard drives and the data on them. *See State v. Smith*, 327 Or 366, 373, 963 P2d 642 (1998) ("[I]f Article I, section 9, is to have any meaning, it must be read in light of the ever-expanding capacity of individuals and the government to gather information by technological means. It must, in other words, speak to every possible form of invasion—physical, electronic, technological, and the like.").[1]

---

[1] Although my focus is primarily on defendant's possessory right to destroy his data, I note that the circumstances here—the contractual obligation on the part of the state to destroy the hard drive and the legal norm that police cannot simply retain forever all data that comes into their possession as part of a search or seizure of a computer or device—provide a clear answer to the "fundamental question" for purposes of recognizing a continuing privacy interest in this circumstance apart from any possessory interest: whether the government's conduct, if engaged in wholly at the discretion of the government, would significantly impair

Because the 2017 warrant was only possible because of prior misconduct by the state—its failure to destroy the hard drives when it was required to do so—the burden of proof shifts to the state to show that the evidence was not tainted by that misconduct. *State v. Johnson*, 335 Or 511, 521, 73 P3d 282 (2003); *see also State v. Tardie*, 319 Or App 229, 241, 509 P3d 705, *rev den*, 370 Or 303 (2022) (describing burden shifting). The state does not advance any argument that the evidence was not tainted by the failure to destroy the hard drives, nor could it.[2] Again, the warranted search was only possible because the state had hard drives that, at the time of the search, should not have been in its possession. Accordingly, the trial court erred in denying the motion to suppress.

Moreover, the denial of the motion was prejudicial, and the state does not argue otherwise. The state's case relied heavily on C's testimony about events that occurred

---

the people's freedom from scrutiny. The answer is a resounding yes. According to the state, defendant lost all possessory and privacy interests as part of his plea, notwithstanding the state's obligation to destroy the hard drives in conjunction with that plea. If that were the case, then the state would not even have been required to get the 2017 search warrant at all; it could have obtained the plea and then immediately rummaged through the hard drives wholly at its own discretion, searching for evidence of crimes without any suspicion whatsoever, and defendant's only remedy would have been to try to undo the plea agreement. That cannot be the law if Article I, section 9, is to be given effect.

[2] The record developed at the suppression hearing did not address exactly how the searches of the hard drives and the discovered evidence overlapped or exactly what evidence formed the basis for the charges to which defendant pleaded guilty based on the 2003 search. There was trial testimony indicating that the video that the state offered as an exhibit appears on "forensic reports, both from 2003 and 2018." However, there was also testimony from the detective to the effect that, "in August of 2003 when [the detective] looked through the defendant's computers," the detective did not "find anything that showed [the detective] who [C] was[.]" And the detective explained that the 2017 search warrant was to re-examine and "unencrypt about close to 15,000 files on the three hard drives that we had that we had not been previously able to examine due to technology." The parties on appeal have framed the issues in terms of defendant's interests in the hard drives, not particular data or files on the hard drives. For that reason, I do not address the effect, if any, the earlier search had on the admissibility of the evidence. *Cf. State v. Munro*, 339 Or 545, 552, 124 P3d 1221 (2005) ("Once the police seized the videotape under the authority of the warrant, any privacy interest that defendant had in the contents of the videotape was destroyed by the authority of the warrant permitting the examination and exhibition of the contents of the videotape. Until such time as defendant regained lawful possession of the videotape, he had no remaining privacy interest in its contents that he could assert.").

15 years earlier, and the state used evidence from the hard drives—child pornography and other data, like Internet searches and AOL history—to corroborate C's testimony. I cannot say that the admission of that evidence was harmless. As such, I would reverse and remand.

I respectfully dissent.